Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
05/01/2020 08:08 AM CDT

In re Guardianship of Eliza W.,
a minor child.
Susan W., appellee, v.
Tara W., appellant.

___ N.W.2d ___

Filed February 7, 2020.    No. S-18-1141.

1. **Guardians and Conservators: Judgments: Appeal and Error.** Appeals of matters arising under the Nebraska Probate Code, Neb. Rev. Stat. §§ 30-2201 through 30-2902 (Reissue 2016 & Cum. Supp. 2018), are reviewed for error on the record. When reviewing a judgment for errors on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.

2. **Judgments: Appeal and Error.** An appellate court, in reviewing a judgment for errors on the record, will not substitute its factual findings for those of the lower court where competent evidence supports those findings.

3. **Statutes: Appeal and Error.** Statutory interpretation is a question of law, which an appellate court resolves independently of the trial court.

4. **Statutes: Intent.** When interpreting a statute, the starting point and focus of the inquiry is the meaning of the statutory language, understood in context.

5. **Statutes: Appeal and Error.** Statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous.

6. **Statutes: Legislature: Intent.** While policy statements or statutory preambles may be used, if needed, for assisting in interpreting the legislative intent for the specific act of which the statement is a part, it is generally recognized that such a provision cannot restrict or expand the meaning of the operative portions of a statute if they are unambiguous.

7. ____: ____: ____. Statutory policy statements and preambles cannot be used to arrive at an interpretation that would give words and phrases of the operative text itself a meaning that they cannot bear. Courts are bound to respect not only the purposes a legislative body has selected, but also the means it has deemed appropriate, and prescribed, for the pursuit of those purposes. It is a mistake to assume that anything that furthers a statute's primary purpose is the law and that anything that does not perfectly do so is not.

8. **Statutes.** When a statute specifically provides for exceptions, items not excluded are covered by the statute.

Appeal from the County Court for Douglas County: Marcela A. Keim, Judge. Reversed and remanded with directions.

Jonathan Seagrass, of Legal Aid of Nebraska, for appellant.

Ashley L. Albertsen, Melissa M. Oestmann, and Jacob A. Acers, of Smith, Slusky, Pohren & Rogers, L.L.P., for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Papik, J.

The federal Indian Child Welfare Act (ICWA) and the Nebraska Indian Child Welfare Act (NICWA) provide specific procedures and requirements that apply in certain proceedings involving the custody and adoption of and termination of parental rights to Native American children. This case requires us to decide whether those procedures and requirements apply in a case in which a maternal grandmother sought to establish a guardianship for an Indian child over the objection of her daughter, the child's mother. After interpreting the relevant statutory language, we conclude that the guardianship proceeding at issue was governed by ICWA and NICWA. In addition, we find that the grandmother did not make the showing required by ICWA and NICWA. We therefore reverse the order of the county court establishing the guardianship and remand the cause with directions to vacate the guardianship, dismiss the petition, and return custody to the child's mother.

## BACKGROUND
*Petition for Guardianship.*

This case began when Susan W. filed a petition asking the Douglas County Court to appoint her as temporary and permanent guardian for her granddaughter, Eliza W. In the petition, Susan alleged that Eliza had lived with Susan and her husband, Jay W., since Eliza's birth; that Eliza's mother, Tara W., only intermittently resided at Susan and Jay's home; that neither Tara nor Eliza's father was able to meet Eliza's financial, physical, and emotional needs; that Susan and Jay provided the primary financial, physical, and emotional support for Eliza; and that the appointment of a guardian was in the best interests of Eliza and necessary to protect and care for her. Eliza was 4 years old at the time Susan filed the petition.

On the same day Susan filed the petition for guardianship, she filed an ex parte application requesting that the county court immediately appoint her as temporary guardian until a hearing could be held on the matter. The court granted Susan's application and appointed her as temporary guardian and conservator for Eliza.

Susan later filed an amended petition. The amended petition contained many of the same allegations as the original, but also included an assertion that Jay "is a registered member of the Muscogee Creek Indian Nation" and that Eliza "is subject to [ICWA]."

At her first appearance in a hearing in this matter, Tara, representing herself, objected to the appointment of Susan as guardian.

*Requests for Appointed Counsel.*

Tara requested on several occasions that she be appointed counsel. Tara initially filed a form document used to request appointed counsel in custodial sanction cases. On that form document, Tara asserted that she was entitled to appointed counsel under a provision of NICWA, Neb. Rev. Stat. § 43-1505(2) (Reissue 2016), that she had no forms of income,

and that she received public assistance in the form of food stamps and Medicaid.

Tara later submitted a letter to the court in which she requested appointment of counsel under § 43-1505(2). Documents indicating that Tara was a citizen of the Muscogee (Creek) Nation and that she was eligible to receive food stamps and Medicaid were attached to the letter.

Tara again requested that she be appointed counsel at a hearing prior to trial. She again asserted an entitlement to counsel under § 43-1505(2) on the grounds that Susan's petition was a "removal, placement, or termination proceeding" for purposes of that statutory provision and that Tara was indigent.

A discussion between the court and Tara regarding her entitlement to counsel under § 43-1505(2) followed. The court expressed skepticism about whether Tara was entitled to appointed counsel under § 43-1505(2) in a guardianship proceeding. The court also suggested that Tara had not followed the proper procedure for requesting appointed counsel. The court did not expressly rule on Tara's requests for counsel, and Tara continued to represent herself at all proceedings in the county court.

*Trial on Petition for Guardianship.*

At the trial on Susan's petition, Susan testified that Eliza had lived her entire life in Susan and Jay's home. She testified that although Tara also lived there and provided Eliza with some care, Tara had on prior occasions left the home without notice, leaving Susan to care for Eliza. Susan testified that she and Jay were Eliza's primary caregivers and that Tara functioned more like a babysitter for Eliza. Susan also testified to her belief that Tara previously had problems with substance abuse and that she exposed Eliza to individuals with criminal backgrounds.

Jay also testified and generally agreed with Susan's testimony. In addition, he testified that he was of Native American descent and that through his lineage, Eliza was a member of the Muscogee (Creek) Nation Tribe.

Susan called a physician to testify. He testified that he was friends with Susan and Jay and had served as their family physician. He also testified that his daughter had served as Eliza's babysitter. Much of the physician's testimony was based on his observations of members of Eliza's family outside of a physician-patient relationship. Although he testified that based on his observations, Susan was Eliza's primary caregiver, he testified that he had observed Tara and Eliza together and believed they had a good relationship, loved each other, and interacted well. When asked whether he would have any concerns if the court did not appoint Susan as guardian, he testified that he believed Susan and Jay were providing Eliza with the proper physical and emotional support and that he did not "know that Tara would be able to do that."

Tara testified in her own behalf. She testified that when Eliza was born, Tara was working full time and was Eliza's primary caregiver. She testified that she was diagnosed with viral meningitis in November 2016 and that she continued to suffer from associated headaches at the time of trial. She testified that after her medical condition began to improve, she enrolled in college, and that she, Susan, and Jay began to share duties caring for Eliza. Tara testified that her relationship with her parents began to sour in 2018. At that point, she decided that she and Eliza should move out of her parents' home. Tara then lived with Eliza at the home of a friend, Mark Keller, for a time. She also informed her parents she was considering moving to Oklahoma with Eliza.

Tara also called Keller as a witness. Keller testified that Tara and Eliza had lived at his home with his four children. Keller testified that he did not believe there was any reason Eliza would be harmed while staying at his home. Keller admitted on cross-examination that he had previously been convicted of felony drug possession charges.

In closing argument, Tara argued that Susan had not made the showing necessary for the appointment of a guardianship under ICWA and NICWA. In particular, she emphasized that

ICWA and NICWA required expert testimony proving Tara's continued custody of Eliza was likely to result in serious emotional or physical damage to Eliza and that no such testimony had been provided.

*Appointment of Guardian.*

At the conclusion of the evidence at trial, the county court stated on the record that it had found a sufficient basis for the appointment of Susan as Eliza's guardian. It stated that the evidence showed that Tara was not a "fit and proper person to care for Eliza; that she is unable, at this time, to provide a safe and secure environment for her." In what was presumably a reference to Tara's arguments regarding the applicability of ICWA and NICWA, the court also stated that the request for a guardianship was "not a removal proceeding" or "a foster care placement proceeding." The court later entered a written order, which did not mention ICWA or NICWA, appointing Susan as guardian for Eliza.

Tara timely appealed.

## ASSIGNMENTS OF ERROR

Tara assigns, condensed and restated, that the district court erred (1) by failing to apply ICWA and NICWA to the guardianship proceeding and (2) by concluding that Tara was unfit to care for Eliza or that she had forfeited her right to custody.

## STANDARD OF REVIEW

[1,2] Appeals of matters arising under the Nebraska Probate Code, Neb. Rev. Stat. §§ 30-2201 through 30-2902 (Reissue 2016 & Cum. Supp. 2018), are reviewed for error on the record. *In re Guardianship of K.R., ante* p. 1, 932 N.W.2d 737 (2019). When reviewing a judgment for errors on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id.* An appellate court, in reviewing a judgment for errors on the record, will not substitute its

factual findings for those of the lower court where competent evidence supports those findings. *Id.*

[3] Statutory interpretation is a question of law, which an appellate court resolves independently of the trial court. *Griffith v. Nebraska Dept. of Corr. Servs., ante* p. 287, 934 N.W.2d 169 (2019).

## ANALYSIS

Tara argues that the county court did not comply with ICWA and NICWA when it appointed Susan as guardian for Eliza. The parties dispute, however, whether ICWA and NICWA apply in these circumstances. We therefore begin our analysis with that question.

### Do ICWA and NICWA Apply?

We have previously described ICWA and NICWA as generally providing "heightened protection to the rights of Indian parents, tribes, and children in proceedings involving custody, termination, and adoption." *In re Adoption of Kenten H.*, 272 Neb. 846, 853, 725 N.W.2d 548, 554 (2007). Tara argues, as she argued in the county court, that the protections of ICWA and NICWA apply to a "foster care placement" and that the guardianship proceeding at issue here meets the definition of "foster care placement" under 25 U.S.C. § 1903(1)(i) (2012) and Neb. Rev. Stat. § 43-1503(3)(a) (Reissue 2016). Susan disagrees that the guardianship proceeding qualifies as a "foster care placement."

[4,5] To decide the parties' dispute, we must turn to the language of ICWA and NICWA, particularly those statutes' definitions of "foster care placement." As we often say, the starting point and focus of the inquiry when interpreting a statute is the meaning of the statutory language, understood in context. See *State v. Garcia*, 301 Neb. 912, 920 N.W.2d 708 (2018). Our analysis must begin with the text, because statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation

to ascertain the meaning of statutory words which are plain, direct, and unambiguous. *State v. Wal*, 302 Neb. 308, 923 N.W.2d 367 (2019).

ICWA and NICWA's definitions of "foster care placement" are substantially the same. NICWA defines "foster care placement" as follows:

> [A]ny action removing an Indian child from his or her parent or Indian custodian for temporary or emergency placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated.

§ 43-1503(3)(a). ICWA's definition is nearly the same, except that it contains no reference to emergency placement. 25 U.S.C. § 1903(1)(i).

An application of our familiar principles of statutory interpretation suggests that the guardianship proceeding initiated by Susan falls within the definitions of "foster care placement" in ICWA and NICWA. The definitions include four straightforward elements: (1) an action removing an Indian child from his or her parent or Indian custodian, (2) temporary placement (or emergency placement in NICWA) in a foster home or institution or the home of a guardian or conservator, (3) the parent or Indian custodian cannot have the child returned upon demand, and (4) parental rights are not terminated, each of which appear to be present here. The object of the guardianship proceeding was to remove custody of Eliza from her parent, Tara, and place custody with Susan, who would serve as guardian. In addition, our law recognizes guardianships as temporary custody arrangements, the creation of which does not terminate parental rights, but which cannot be terminated without court approval. See *In re Guardianship of D.J.*, 268 Neb. 239, 682 N.W.2d 238 (2004); § 30-2616.

Based on similar reasoning, courts from a number of other jurisdictions have interpreted ICWA's definition of "foster care placement" to include guardianship proceedings. See, e.g.,

*Matter of Guardianship of Q.G.M.*, 808 P.2d 684 (Okla. 1991); *Empson-Laviolette v. Crago*, 280 Mich. App. 620, 760 N.W.2d 793 (2008); *In re Custody of A.K.H.*, 502 N.W.2d 790 (Minn. App. 1993).

The only argument Susan makes based on the statutory definition of "foster care placement" goes to the evidence of one element, rather than the definition itself. Susan claims that there was no demonstration that Eliza is an "Indian child" for purposes of ICWA and NICWA. This argument is somewhat puzzling since Susan alleged in her amended petition that Eliza is subject to ICWA, her counsel conceded at trial that Eliza was "an Indian child" under ICWA and NICWA, and Jay testified that Eliza is a member of the Muscogee (Creek) Nation Tribe. Moreover, at trial, Susan offered and the court received into evidence a letter from the Muscogee (Creek) Nation stating that Eliza was a tribal citizen or eligible for enrollment through Tara. This evidence shows that Eliza qualifies as an "Indian child." Both ICWA and NICWA define the term as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4); § 43-1503(8).

Rather than focusing on the statutory definition of "foster care placement," Susan primarily points to other provisions of ICWA and NICWA and contends that those other provisions should lead us to conclude that a "foster care placement" occurs only when proceedings are initiated by the government. We address these other statutory provisions below, but, as we will explain, we are not persuaded by Susan's arguments.

First, Susan points to broad statements of policy in both ICWA and NICWA. In particular, she refers us to 25 U.S.C. § 1902 (2012), which provides in part:

> [I]t is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment

of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture.

In addition, she directs us to Neb. Rev. Stat. § 43-1502 (Reissue 2016), in which the Nebraska Legislature stated that the purpose of NICWA "is to clarify state policies and procedures regarding the implementation by the State of Nebraska of [ICWA]."

Susan contends that these provisions show that in passing ICWA and NICWA, Congress and our Legislature were concerned with situations in which government actors took actions to remove Indian children from their families and placed them in homes lacking an appreciation for Native American culture. Susan contends that this purpose is not served in this case, because the government is not a party to the guardianship proceeding. Although Susan does not cite the case, she is asking us to follow the same approach taken by the Montana Supreme Court in *Application of Bertelson*, 189 Mont. 524, 617 P.2d 121 (1980). In that case, the court relied on the language in 25 U.S.C. § 1902 and concluded that ICWA should not apply to an intrafamily custody dispute. As we will explain, however, we believe the approach taken by the *Application of Bertelson* court places too much weight on 25 U.S.C. § 1902.

[6] As noted above, 25 U.S.C. § 1902 of ICWA is a policy statement. While this court has previously held that policy statements or statutory preambles may be used, "if needed, for assisting in interpreting the legislative intent for the specific act of which the statement is a part," *State v. Buckman*, 267 Neb. 505, 516, 675 N.W.2d 372, 381 (2004), it is generally recognized that such a provision cannot restrict or expand the meaning of the operative portions of a statute if they are unambiguous. See, generally, 2A Norman J. Singer & Shambie Singer, *Statutes and Statutory Construction*, § 47:4 (7th ed. 2014). No less an authority than the U.S. Supreme Court recently articulated this understanding. The Court rejected an argument

based on statutory statements of purpose, explaining that such provisions, "by their nature 'cannot override [a statute's] operative language.'" *Sturgeon v. Frost*, ___ U.S. ___, 139 S. Ct. 1066, 1086, 203 L. Ed. 2d 453 (2019), quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 220 (2012).

[7] We find sound the view that statutory policy statements and preambles cannot be used to arrive at an interpretation that would "give words and phrases of the [operative] text itself a meaning that they cannot bear." Scalia & Garner, *supra* at 218. After all, courts are bound to respect not only the purposes a legislative body "has selected, but [also] the means it has deemed appropriate, and prescribed, for the pursuit of those purposes." *MCI Telecommunications Corp. v. American Telephone & Telegraph Co.*, 512 U.S. 218, 231 n.4, 114 S. Ct. 2223, 129 L. Ed. 2d 182 (1994). It is thus a mistake to assume that anything that furthers a statute's primary purpose is the law and that anything that does not perfectly do so is not. See, *Henson v. Santander Consumer USA Inc.*, ___ U.S. ___, 137 S. Ct. 1718, 198 L. Ed. 2d 177 (2017); Scalia & Garner, *supra* at 219.

Here, we find that Susan is asking us to use the policy statement in 25 U.S.C. § 1902 to give "foster care placement" a meaning that the text defining the phrase cannot bear. As we have already indicated, Susan can point to nothing in the definition of "foster care placement" suggesting it is limited to proceedings initiated by a state actor. In fact, the language expressly indicates otherwise—the phrase is defined to include "any action" in which the four elements discussed above are present, not just some. See, 25 U.S.C. § 1903(1)(i); § 43-1502(3)(a); *In re Interest of Powers*, 242 Neb. 19, 23, 493 N.W.2d 166, 169 (1992) ("in popular parlance, the word 'any' usually means all or every").

[8] Susan's preferred interpretation also fails to account for the fact that ICWA and NICWA expressly create a similar, but narrower, exception than the one she asks us to infer.

ICWA and NICWA exclude from their scope, "an award, in a divorce proceeding, of custody to one of the parents." 25 U.S.C. § 1903(1); § 43-1503(3). In other words, both Congress and the Nebraska Legislature specifically excluded one type of exclusively intrafamily custody dispute from the protections of ICWA and NICWA. One of our rules of statutory interpretation provides that when a statute specifically provides for exceptions, items not excluded are covered by the statute. *Castonguay v. Retelsdorf*, 291 Neb. 220, 865 N.W.2d 91 (2015). Susan's preferred interpretation obviously runs counter to this canon, because she asks us to find that all intrafamily custody disputes are not covered by ICWA and NICWA when Congress and our Legislature excluded only some.

Moreover, if, as Susan asserts, ICWA and NICWA apply only to actions initiated by the government, the statutory exclusion for awards of custody in divorce proceedings would serve no purpose. This, too, runs counter to our rules of statutory interpretation. We strive, if possible, to give effect to all parts of a statute such that no sentence, clause, or word is rendered meaningless. See *State v. Clemens*, 300 Neb. 601, 915 N.W.2d 550 (2018). Several courts have pointed to ICWA's exclusion of custody awards in divorce proceedings as a reason for not following the Montana Supreme Court's approach in *Application of Bertelson*, 189 Mont. 524, 617 P.2d 121 (1980). See, e.g., *In re Custody of A.K.H.*, 502 N.W.2d 790 (Minn. App. 1993); *Matter of Guardianship of Q.G.M.*, 808 P.2d 684 (Okla. 1991). See, also, *A.B.M. v. M.H.*, 651 P.2d 1170 (Alaska 1982) (rejecting argument based on *Application of Bertelson* as contrary to the express provisions of ICWA).

Neither are we persuaded by Susan's argument that we should conclude that the protections of ICWA and NICWA do not apply to proceedings initiated by parties other than the government, based on NICWA's "active efforts" provision. NICWA requires parties seeking to effect a foster care placement of or termination of parental rights to an Indian child to prove that they used "active efforts" to "provide remedial services and

rehabilitative programs designed to prevent the breakup of the Indian family or unite the parent or Indian custodian with the Indian child and that these efforts have proved unsuccessful." § 43-1505(4). Elsewhere, NICWA provides that "[a]ctive efforts shall mean and include, but not be limited to" several specific measures. § 43-1503(1).

Susan describes the "active efforts" measures codified in § 43-1503(1) as a "colossal undertaking and expenditure of resources" and contends it is clear this standard was not intended to apply to private individuals initiating guardianship proceedings. Brief for appellee at 17. Susan's argument fails to account for our rejection of the notion that the measures listed in § 43-1503(1)(a) to (h) form a "checklist" in which the initiating party is required to show compliance with each item. See *In re Adoption of Micah H.*, 301 Neb. 437, 450, 918 N.W.2d 834, 846 (2018). And, in any event, Susan fails to identify any statutory text that supports her argument regarding legislative intention.

For all these reasons, we are not persuaded by Susan's arguments that the guardianship proceeding she initiated does not qualify as a "foster care placement" under ICWA and NICWA.

### Did County Court Comply With ICWA and NICWA?

Our conclusion that this guardianship proceeding qualified as a "foster care placement" for purposes of ICWA and NICWA does not resolve the parties' disagreements. Tara asserts that the guardianship proceeding failed to comply with ICWA and NICWA in a number of ways. She contends that she was denied a right to appointed counsel which she possessed under ICWA and NICWA, that Susan failed to comply with notice requirements of ICWA and NICWA, that Susan failed to demonstrate the "active efforts" required by ICWA and NICWA, and that Susan failed to meet the heightened standard of proof required by ICWA and NICWA. To this, Susan offers an alternative

argument: that even if the county court erroneously concluded that the guardianship proceeding was not a "foster care placement," it nonetheless complied with ICWA and NICWA in all respects. As we will explain, we again disagree.

At first glance, it may appear that the county court clearly erred by not granting Tara's requests for appointed counsel. ICWA and NICWA provide that "[i]n any case in which the court determines indigency, the parent or Indian custodian shall have the right to court-appointed counsel in any removal, placement, or termination proceeding." 25 U.S.C. § 1912(b) (2012); § 43-1505(2). This language appears to grant Tara a right to court-appointed counsel in the guardianship proceeding if she was indigent. It is not clear, however, whether the county court declined to appoint counsel based on a determination that ICWA and NICWA did not apply or because it found that Tara used an incorrect procedure or failed to adequately demonstrate indigency. In the end, we find it unnecessary to sort out this question and many other ICWA and NICWA compliance arguments raised by Tara, because we find that Susan failed to meet the heightened standard of proof imposed by ICWA and NICWA.

NICWA provides that a court may not order foster care placement "in the absence of a determination by the court, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." § 43-1505(5). ICWA contains a provision that is substantially the same. See 25 U.S.C. § 1912(e). ICWA and NICWA thus not only impose a heightened standard of proof for "foster care placements," they also require that the person seeking the placement meet that standard with expert testimony. Tara focuses her argument on the expert testimony requirement, contending that no qualified expert witness testified at trial.

Susan concedes that none of the witnesses she called as part of her case provided the expert testimony required by ICWA

and NICWA. She maintains, however, that the expert witness requirement was met through testimony provided by Tara. We disagree and find that Tara neither qualified as an expert nor provided expert testimony.

This court has previously relied on guidelines promulgated by the federal Bureau of Indian Affairs to determine whether a witness qualifies as an expert under ICWA. See *In re Interest of C.W. et al.*, 239 Neb. 817, 479 N.W.2d 105 (1992), *overruled on other grounds, In re Interest of Zylena R. & Adrionna R.*, 284 Neb. 834, 825 N.W.2d 173 (2012). Those guidelines recognized the following categories of individuals as likely to meet the requirements of ICWA:

"(i) A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and childrearing practices.

"(ii) A lay expert witness having substantial experience in the delivery of child and family services to Indians, and extensive knowledge of prevailing social and cultural standards in childrearing practices within the Indian child's tribe.

"(iii) A professional person having substantial education and experience in the area of his or her specialty."

239 Neb. at 824, 479 N.W.2d at 111, quoting Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,854, 67,593 (1979) (not codified). NICWA includes a definition of "qualified expert witness" that is similar to these guidelines. See § 43-1503(15).

More recently, the Bureau of Indian Affairs issued formal regulations and new guidelines discussing the implementation of ICWA. With respect to the expert witness requirement, the formal regulations provide as follows:

A qualified expert witness must be qualified to testify regarding whether the child's continued custody by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child and should be

qualified to testify as to the prevailing social and cultural standards of the Indian child's Tribe.

25 C.F.R. § 23.122(a) (2019).

The accompanying new guidelines indicate that there may be some cases in which expert testimony from an individual with knowledge of tribal culture is not required. They provide, in part:

> The rule does not, however, strictly limit who may serve as a qualified expert witness to only those individuals who have particular Tribal social and cultural knowledge. The rule recognizes that there may be certain circumstances where a qualified expert witness need not have specific knowledge of the prevailing social and cultural standards of the Indian child's Tribe in order to meet the statutory standard. For example, a leading expert on issues regarding sexual abuse of children may not need to know about specific Tribal social and cultural standards in order to testify as a qualified expert witness regarding whether return of a child to a parent who has a history of sexually abusing the child is likely to result in serious emotional or physical damage to the child. Thus, while a qualified expert witness should normally be required to have knowledge of Tribal social and cultural standards, that may not be necessary if such knowledge is plainly irrelevant to the particular circumstances at issue in the proceeding.

U.S. Dept. of Interior, Bureau of Indian Affairs, Guidelines for Implementing the Indian Child Welfare Act G.2 at 54 (Dec. 2016).

Susan argues that Tara qualified as an expert witness based on her prior attendance at a Native American college, her ability to speak Cherokee, and the fact that she is pursuing a bachelor's degree that will include two "subconcentrations," one of which is in Native American studies. Susan also asserts in her brief that Tara testified to serving as president of the "Native Indian Centered Education" program of Omaha Public

Schools. Brief for appellee at 25. This assertion, however, misstates the record. Tara testified to serving as president of a parental advisory board affiliated with another educational program. There is no indication in the record this educational program was similarly focused on Native American children.

We harbor serious doubts that the record shows that Tara was qualified to testify regarding prevailing social and cultural standards of Eliza's tribe. The record shows only that Tara was a member of the tribe, spoke Cherokee, and had pursued some Native American studies, the scope of which was unclear. There is no indication that she was recognized by a tribal community as knowledgeable of Indian customs and childrearing practices or that she had experience in the delivery of child and family services to Indians. When presented with a similar record, the Nebraska Court of Appeals concluded that a child's mother was not a qualified expert under NICWA. See *In re Interest of Ramon N.*, 18 Neb. App. 574, 789 N.W.2d 272 (2010).

But even if Tara was qualified to testify regarding prevailing social and cultural standards of Eliza's tribe, there is no indication in the record that she was qualified to provide expert testimony regarding whether her continued custody of Eliza was likely to result in serious emotional or physical damage to Eliza. The recent formal regulations make clear an expert "*must* be qualified" to present such testimony. 25 C.F.R. § 23.122(a) (emphasis supplied). In addition, even if Tara was qualified to provide such testimony, we do not believe she actually did so. In support of her argument that Tara provided the required expert testimony, Susan directs us to portions of Tara's testimony and contends they show that Tara does not consider Eliza's best interests and that it was in Eliza's best interests to remain in Susan's care. In that testimony, however, Tara was explaining why she made certain decisions concerning Eliza. Regardless of whether Tara's explanations were compelling, this factual testimony cannot be fairly construed as an expert opinion as to whether her continued custody of

Eliza would likely result in serious emotional or physical damage to Eliza.

From all appearances, both Susan's trial counsel and the county court assumed that this was not a "foster care placement" and that therefore Susan need only show that Tara was an unfit parent in order to be appointed as guardian. As we have explained, however, that assumption was incorrect. This was a "foster care placement" for purposes of ICWA and NICWA, and Congress and our Legislature have made a policy decision that courts cannot order such a placement based on an ordinary showing of parental unfitness alone. Because there was an absence of the expert testimony required by ICWA and NICWA, the county court erred by appointing Susan as Eliza's guardian.

*Disposition.*

Having determined that Susan did not make the required showing under ICWA and NICWA, all that remains is the disposition of this appeal. Tara suggests that Neb. Rev. Stat. § 43-1512 (Reissue 2016) is determinative. Section 43-1512 states:

> When any petitioner in an Indian child custody proceeding before a state court has improperly removed the child from custody of the parent or Indian custodian or has improperly retained custody after a visit or other temporary relinquishment of custody, the court shall decline jurisdiction over such petition and shall forthwith return the child to his or her parent or Indian custodian unless returning the child to his or her parent or custodian would subject the child to a substantial and immediate danger or threat of such danger.

ICWA contains a nearly identical provision. See 25 U.S.C. § 1920 (2012).

Tara contends that the county court improperly removed Eliza from the custody of Tara and that, therefore, § 43-1512 applies and requires us to reverse the order and remand the

cause to the county court for a determination of whether returning Eliza to Tara would subject Eliza to substantial and immediate danger or a threat of such danger. We disagree that this provision applies here.

The language in § 43-1512 expressly applies when "any *petitioner*" improperly removes an Indian child from the custody of his or her parent or improperly retains custody of the child. (Emphasis supplied.) See, also, 25 U.S.C. § 1920 (same). The provision gives no indication that it also applies where a court order brings about the removal of a child and the petitioner merely follows that order. Indeed, it would be more than a stretch to call such a removal "improper." We are not the only court to have read this language to apply only when parties remove or retain custody of the child extralegally. See, e.g., *D.E.D. v. State*, 704 P.2d 774, 782 (Alaska 1985) (concluding 25 U.S.C. § 1920 "'is aimed at those persons who improperly secure or improperly retain custody of the child without the consent of the parent or Indian custodian and without the sanction of law'" (emphasis omitted), quoting Indian Child Welfare Act of 1978, Pub. L. No. 95-608, § 110, 92 Stat. 3069).

Here, Susan did not improperly remove or retain custody of Eliza extralegally; rather, a county court order removed Eliza from Tara's custody. Consequently, we conclude that § 43-1512 does not apply.

Because ICWA and NICWA do not set forth specific rules governing our disposition in this case, we believe it appropriate to dispose of the case as we would an ordinary guardianship proceeding in which a petitioner failed to meet his or her burden of proving the right to custody of a child. We thus reverse, and remand with directions to vacate the guardianship, dismiss the petition, and return Eliza to Tara's custody. See, e.g., *In re Guardianship of D.J.*, 268 Neb. 239, 682 N.W.2d 238 (2004) (reversing, and remanding with directions to terminate guardianship and return child to custody of mother where grandparents failed to prove child's mother forfeited parental rights); *In re Interest of Tyler W.*, No. A-11-1097, 2012 WL

5328645 (Neb. App. Oct. 30, 2012) (selected for posting to court website) (reversing, and remanding with instructions to dismiss guardianship action where petitioner failed to prove mother was unfit or forfeited right to custody of child). See, also, *In re Interest of Borius H. et al.*, 251 Neb. 397, 558 N.W.2d 31 (1997) (explaining that because State did not meet burden to allow for continued detention of juvenile, appellate courts lacked authority to order continued detention).

## CONCLUSION

The record does not contain the expert testimony required by ICWA and NICWA, and therefore the county court's decision to appoint Susan as guardian was not supported by competent evidence. Because of the failure of proof, we must reverse, and remand with directions to vacate the guardianship and dismiss the petition.

Reversed and remanded with directions.