Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
02/04/2022 08:07 AM CST

State of Nebraska, appellee, v.
James E. Taylor, appellant.
___ N.W.2d ___

Filed November 12, 2021.    No. S-21-096.

1. **Appeal and Error.** It is a fundamental rule of appellate practice that an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court.

2. \_\_\_\_. A generalized and vague assignment of error that does not advise an appellate court of the issue submitted for decision will not be considered.

3. **Criminal Law: Courts: Appeal and Error.** In an appeal of a criminal case from the county court, the district court acts as an intermediate court of appeals, and its review is limited to an examination of the record for error or abuse of discretion.

4. **Courts: Appeal and Error.** Both the district court and a higher appellate court generally review appeals from the county court for error appearing on the record.

5. **Judgments: Appeal and Error.** When reviewing a judgment for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, not unreasonable.

6. **Courts: Appeal and Error.** An appellate court independently reviews questions of law in appeals from the county court.

7. **Criminal Law: Courts: Appeal and Error.** When deciding appeals from criminal convictions in county court, an appellate court applies the same standards of review that it applies to decide appeals from criminal convictions in district court.

8. **Trial: Convictions: Evidence: Appeal and Error.** An appellate court will sustain a conviction in a bench trial of a criminal case if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support that conviction. In making this determination, an

appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, evaluate explanations, or reweigh the evidence presented, which are within a fact finder's province for disposition. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

9. **Ordinances: Appeal and Error.** Interpretation of a municipal ordinance is a question of law, on which an appellate court reaches an independent conclusion irrespective of the determination made by the court below.

10. **Statutes: Appeal and Error.** The interpretation of statutes and regulations presents a question of law which an appellate court reviews de novo.

11. **Statutes: Intent.** When interpreting a statute, the starting point and focus of the inquiry is the meaning of the statutory language, understood in context.

12. **Statutes: Appeal and Error.** Statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous.

13. **Statutes.** It is not within the province of the courts to read meaning into a statute that is not there or to read anything direct and plain out of a statute.

14. **Drunk Driving: Words and Phrases.** As used in Neb. Rev. Stat. § 60-6,196 (Reissue 2010), the phrase "under the influence of alcoholic liquor or of any drug" requires the ingestion of alcohol or drugs in an amount sufficient to impair to any appreciable degree the driver's ability to operate a motor vehicle in a prudent and cautious manner.

Appeal from the District Court for Lancaster County, Susan I. Strong, Judge, on appeal thereto from the County Court for Lancaster County, Joseph E. Dalton, Judge. Judgment of District Court affirmed.

Joe Nigro, Lancaster County Public Defender, and James Sieben for appellant.

Robert E. Caples, Assistant Lincoln City Prosecutor, for appellee.

Heavican, C.J., Cassel, Stacy, Funke, Papik, and Freudenberg, JJ., and Thompson, District Judge.

Papik, J.

The State prosecuted James E. Taylor for violating a municipal ordinance prohibiting driving under the influence. The State's theory was that Taylor was driving while impaired by his prescription medication. Taylor was convicted in the county court and unsuccessfully appealed his conviction to the district court. He now appeals again, arguing that the State could not establish a driving under the influence conviction on the theory he was under the influence of prescription medications and that the evidence was otherwise insufficient to support his conviction. We disagree with Taylor's arguments and therefore affirm.

BACKGROUND

The State charged Taylor with several offenses arising out of a traffic stop in Lincoln, Nebraska, in July 2019. The sole charge relevant to this appeal was that Taylor violated Lincoln Mun. Code § 10.16.030 (2017), a certified copy of which is in our record. That ordinance makes it "unlawful for any person to operate or be in the actual physical control of any motor vehicle while under the influence of alcoholic liquor, or of any drug."

At trial, the State called the police officers who completed the traffic stop, Matthew Stegman and Bryan Gruber. Stegman testified that because he was training Gruber, they were riding together that night. Stegman and Gruber testified that just after 11 p.m., they saw a vehicle driving on a Lincoln street with its headlights off. While following the vehicle, the officers saw it cross the centerline and strike a curb. Gruber initiated a traffic stop. Taylor was the vehicle's only occupant.

Stegman testified about his interaction with Taylor during the traffic stop. Stegman asked Taylor why his headlights were not on and why he struck the curb. Taylor responded that he thought his headlights were on and that he fell asleep while driving. Stegman also testified that when he asked Taylor whether he had taken any medications or drugs recently, Taylor responded that he had taken some prescription pills.

Stegman observed that Taylor had "somewhat slurred speech" and appeared "overtired" and not "completely aware of what [was] going on."

Stegman testified that he then asked Taylor to get out of the vehicle so that he could administer field sobriety tests. Taylor's performance on several field sobriety tests indicated that he was impaired. Gruber testified that while Stegman was administering the field sobriety tests, Taylor was "basically falling asleep periodically during the test." The officers did not smell any alcohol on Taylor's breath, and Taylor denied using alcohol. A preliminary breath test did not detect any alcohol on Taylor's breath.

As a result of Taylor's driving and his performance on the field sobriety tests, the officers transported him to another location so that he could be evaluated by a drug recognition expert (DRE). Prior to the DRE evaluation, Taylor submitted to a formal breath test on a DataMaster machine, which also showed no indication of alcohol. After Stegman read Taylor his *Miranda* rights, Taylor also agreed to be interviewed. During this interview, Taylor again acknowledged recently taking medications. He informed the officers he was taking the medications for mental and behavioral health reasons and provided the names of those medications. The medications included Seroquel and Effexor. According to Stegman, Taylor stated that when taking the medications, he did get "sleepy," but that he felt he could still drive safely.

Sgt. Max Hubka, the certified DRE who evaluated Taylor, also testified. He described the multistep DRE protocol, which included performance tests of Taylor, the formation of an opinion by Hubka, and toxicology. Hubka observed that during the evaluation, Taylor appeared tired and stated that he was tired. Hubka also observed that Taylor's speech was slow, "with a slight slur to it." Hubka testified that Taylor told him what prescription medications he had taken that evening and that they included Seroquel and Effexor. Hubka testified that based on his training, he knew those two medications to

be central nervous system (CNS) depressants. Hubka testified over Taylor's objection that the term "CNS depressants" refers to a category of drugs that "slow[] the processes of the body." According to Hubka, CNS depressants would include antidepressants and antipsychotics and Seroquel is an antipsychotic medication.

Hubka also testified over Taylor's objection that in his opinion, Taylor was under the influence of CNS depressants. Hubka based this opinion on Taylor's performance on field sobriety tests, inability to stay awake, slightly slurred speech, and poor balance, as well as Taylor's agreement with Hubka's opinion that Taylor was not safe to drive and his admission that he had ingested multiple types of CNS depressants before driving.

A forensic scientist in the Nebraska State Patrol Crime Laboratory testified that she analyzed a urine sample provided by Taylor. She explained that her analysis was governed by 177 Neb. Admin. Code, ch. 7 (2007), a certified copy of which was received in evidence. Over Taylor's objection, she testified that in Taylor's urine sample, she detected venlafaxine, the generic term for Effexor, which she characterized as a "mild CNS depressant." She also testified that she detected quetiapine, the generic term for Seroquel, and explained that quetiapine is an antipsychotic medication with "CNS depressant side effects."

In his defense, Taylor called a friend he had visited immediately before the traffic stop. She testified that Taylor had fallen asleep at her residence, but she denied seeing him use any drugs or medications and did not believe he was "high" or under the influence.

Taylor also testified in his own defense. He testified that for at least 5 years prior to the traffic stop, he had prescriptions for and had been taking Effexor and Seroquel. Taylor could not recall ever being told by a doctor that the medications should not be used prior to driving and testified that the labels on the medication bottles directed only that those taking the medications should use caution while driving.

The county court found Taylor guilty of driving under the influence of drugs and sentenced him accordingly. Taylor appealed that conviction to the district court. Taylor challenged several of the county court's evidentiary rulings and argued that the county court had erred in finding him guilty without sufficient evidence. The district court affirmed Taylor's conviction.

Taylor then appealed the district court's decision, and we moved the case to our docket.

## ASSIGNMENT OF ERROR

Taylor's appellate brief sets forth two numbered assignments of error. The second assigned error is that the district court erred by finding that there was sufficient evidence to support the conviction of driving under the influence. We will analyze Taylor's challenge to the sufficiency of the evidence below.

[1,2] Taylor's first assigned error is more general. He asserts that "[t]he district court erred by affirming [Taylor's] conviction in county court of driving under the influence as a matter of law." It is a fundamental rule of appellate practice that an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court. *State v. Iddings*, 304 Neb. 759, 936 N.W.2d 747 (2020). A generalized and vague assignment of error that does not advise an appellate court of the issue submitted for decision will not be considered. *Id.* Taylor's assertion that the district court erred "as a matter of law" without any elaboration as to the nature of that error is the type of generalized assignment of error that we do not consider.

## STANDARD OF REVIEW

[3-7] In an appeal of a criminal case from the county court, the district court acts as an intermediate court of appeals, and its review is limited to an examination of the record for error or abuse of discretion. *State v. Valentino*, 305 Neb. 96, 939 N.W.2d 345 (2020). Both the district court and a higher appellate court generally review appeals from the county court for

error appearing on the record. *Id.* When reviewing a judgment for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id.* But we independently review questions of law in appeals from the county court. *Id.* When deciding appeals from criminal convictions in county court, we apply the same standards of review that we apply to decide appeals from criminal convictions in district court. *Id.*

[8] An appellate court will sustain a conviction in a bench trial of a criminal case if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support that conviction. *State v. Montoya*, 304 Neb. 96, 933 N.W.2d 558 (2019). In making this determination, we do not resolve conflicts in the evidence, pass on the credibility of witnesses, evaluate explanations, or reweigh the evidence presented, which are within a fact finder's province for disposition. *Id.* Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

[9,10] Interpretation of a municipal ordinance is a question of law, on which we reach an independent conclusion irrespective of the determination made by the court below. *Wilkison v. City of Arapahoe*, 302 Neb. 968, 926 N.W.2d 441 (2019). The interpretation of statutes and regulations presents a question of law which we review de novo. *Id.*

## ANALYSIS

Taylor makes two arguments to challenge the sufficiency of the evidence to support his conviction for violating the city of Lincoln (the City) driving under the influence ordinance. His first argument depends on his interpretation of the ordinance. Taylor contends that while the State's theory at trial was that he was under the influence of his prescription medications, those medications do not qualify as "any drug" under the ordinance, and therefore, there was insufficient evidence of

an essential element of the crime. Alternatively, he argues that even if his prescription medications qualify as "any drug," there was insufficient evidence that he was under the influence of those prescription medications. We address each of these arguments below.

### Taylor's Prescription Medications Qualify as "Any Drug" Under Ordinance.

As we have noted, the municipal ordinance at issue criminalizes the operation or actual physical control of a motor vehicle while under the influence of "alcoholic liquor, or of any drug." This language mirrors a state statute, Neb. Rev. Stat. § 60-6,196(1)(a) (Reissue 2010). Another statute authorizes cities and villages to enact ordinances in conformance with § 60-6,196. See Neb. Rev. Stat. § 60-6,197.07 (Reissue 2010).

While the City ordinance refers to driving under the influence of "any drug," Taylor argues that a person can be convicted of violating the ordinance only if the State proves that he or she was under the influence of one of seven drugs listed in a definition of "drug" contained within a regulation promulgated by the Nebraska Department of Health and Human Services (DHHS). Under that regulation, "Drug means any of the following. Marijuana, cocaine, morphine, codeine, phencyclidine, amphetamine, or methamphetamine." 177 Neb. Admin. Code, ch. 7, § 001.13. He contends that the prescription medications he admitted to taking on the night at issue are not among the substances listed in the regulation and that therefore, the evidence was insufficient to support his conviction.

Taylor's understanding of the ordinance rests on a theory of delegation. He contends that the Legislature authorized DHHS to promulgate rules governing the driving under the influence statutes and ordinances and that DHHS has, in an exercise of that authority, chosen to limit the definition of "drug," as it appears in those statutes and ordinances, to the seven substances listed in the above-quoted regulation. Taylor

claims his theory of delegation is supported by Neb. Rev. Stat. § 60-6,201 (Reissue 2010). That statute sets forth certain requirements for chemical tests of blood, breath, and urine, and it directs that if tests are made in conformity with those requirements, the results "shall be competent evidence" in a prosecution for violating a driving under the influence statute or ordinance. See § 60-6,201(1). Among those requirements is a provision that "[t]o be considered valid," such tests "shall be performed according to methods approved by [DHHS]." See § 60-6,201(3).

[11-13] Taylor's argument requires that we interpret the City's driving under the influence ordinance as well as the driving under the influence statutes mentioned above. We apply the same principles to interpret ordinances that we do to interpret statutes. See *Walsh v. City of Omaha Police & Fire Ret. Sys.*, 277 Neb. 554, 763 N.W.2d 411 (2009). When interpreting a statute, the starting point and focus of the inquiry is the meaning of the statutory language, understood in context. *In re Guardianship of Eliza W.*, 304 Neb. 995, 938 N.W.2d 307 (2020). Our analysis begins with the text, because statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous. See *id.* Neither is it within the province of the courts to read meaning into a statute that is not there or to read anything direct and plain out of a statute. *Parks v. Hy-Vee*, 307 Neb. 927, 951 N.W.2d 504 (2020). Applying those rules here, we are not persuaded by Taylor's argument.

Taylor has not pointed to any statutory language providing DHHS with authorization to define the phrase "any drug" as it appears in § 60-6,196(1)(a) or in municipal ordinances authorized by § 60-6,197.07. Neither has he identified any language in either § 60-6,196(1)(a) or the City ordinance incorporating the DHHS regulation definition of "drug." The sole statute upon which Taylor relies for his delegation argument, § 60-6,201, does give DHHS a role to play in driving

under the influence prosecutions, but that role is limited to approving methods and techniques for valid chemical tests. See § 60-6,201(3). And, consistent with that limited role, the DHHS definition of "drug" upon which Taylor relies appears in a regulation setting forth methods and techniques for detecting drug content in urine among those suspected of driving under the influence. See 177 Neb. Admin. Code, ch. 7. In sum, the interpretation Taylor advances would require us to read meaning into either the driving under the influence statutes or the City ordinance. That is not how we interpret statutes or municipal ordinances. See, *Parks, supra*; *Walsh, supra*.

While we find no support for Taylor's interpretation of the phrase "any drug" in the City ordinance, the question remains whether, under that language, the State could establish a conviction under the ordinance on a theory that Taylor was under the influence of his prescription medications, Effexor and Seroquel. We find that it could.

The parties agree that the phrase "any drug" is not defined by the municipal ordinance. Accordingly, we are obligated to interpret the phrase according to its plain and ordinary meaning. See *Robert M. on behalf of Bella O. v. Danielle O.*, 303 Neb. 268, 928 N.W.2d 407 (2019) (holding that undefined statutory terms must be given their plain and ordinary meaning).

The plain and ordinary meaning of the term "drug" would encompass Taylor's prescription medications. In everyday English, it is common to refer to any prescription medication as a prescription "drug." Taylor's medications are no exception. See, e.g., *In re: Seroquel Products Liability Litigation*, 542 F. Supp. 2d 1366, 1367 (J.P.M.L. 2008) (referring to "the prescription drug Seroquel"); *Jackson v. Brotherhood's Relief & Comp. Fund*, 273 Neb. 1013, 1015, 734 N.W.2d 739, 743 (2007) (referring to "a prescription drug called Effexor"). See, also, brief for appellant at 21 ("Effexor and its generic counterpart, [v]enlafaxine, are commonly prescribed drugs").

To be sure, words like "prescription" or "illegal" can modify the term "drug" and thereby refer to different subcategories

of substances, each of which bears the label "drug." The ordinance before us, however, does not limit its coverage to illegal or some other subcategory of drugs. To the contrary, it makes it unlawful to drive under the influence of "*any* drug." Lincoln Mun. Code § 10.16.030 (emphasis supplied). As we have previously recognized, the word "any," read naturally, is expansive and refers to all that fall within a particular category "of whatever kind." See *Rouse v. State*, 301 Neb. 1037, 1044, 921 N.W.2d 355, 361 (2019), quoting *Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 128 S. Ct. 831, 169 L. Ed. 2d 680 (2008) (internal quotation marks omitted). On this basis, we interpreted the statutory phrase "'any law enforcement officer'" to cover "all law enforcement officers." *Rouse*, 301 Neb. at 1043, 921 N.W.2d at 361. In much the same way, we interpret the phrase "any drug" in the City ordinance to refer to all drugs, "of whatever kind," including Taylor's prescription medications.

*Record Contains Sufficient Evidence*
*That Taylor Was Under Influence*
*of His Prescription Medications.*

[14] Taylor next claims that even if his prescription medications qualify as "any drug," there was insufficient evidence in the record that he was under the influence of those medications for purposes of the ordinance. We have said that as used in § 60-6,196, the phrase "under the influence of alcoholic liquor or of any drug" requires the ingestion of alcohol or drugs in an amount sufficient to impair to any appreciable degree the driver's ability to operate a motor vehicle in a prudent and cautious manner. See *State v. Daly*, 278 Neb. 903, 775 N.W.2d 47 (2009). We see no reason not to apply the same standard to determine whether there was evidence that Taylor was "under the influence of . . . any drug" for purposes of the City ordinance.

The record unquestionably contains some evidence to support the State's position that Taylor's ability to drive safely

was impaired as a result of his prescription medications. As recounted above, there was evidence that Taylor was driving at night with his headlights off, that he crossed the centerline of the road, that he struck a curb, that he admitted he had fallen asleep while driving and was very tired, that he showed impairment on field sobriety tests despite having no alcohol in his system, that he admitted to taking his prescription medications earlier that night, and that a urinalysis confirmed the presence of those prescription medications in his system. In addition to all this, Hubka, a certified DRE, testified to his opinion that Taylor was under the influence of his prescription medications.

In the face of all this evidence, Taylor maintains that there was insufficient evidence that he was under the influence of his prescription medications. He argues that some of the evidence summarized above was inadmissible. He points to evidence that he was tired on the night of the traffic stop and claims that was the reason for his poor driving. Finally, he makes a public policy argument that a person should not be convicted of driving under the influence if he or she is shown only to be under the influence of medications taken as prescribed.

Each of Taylor's arguments is unavailing. Taylor did not assign error to the district court's resolution of his claim that the county court received inadmissible evidence, so that issue is not before us. See *State v. Iddings*, 304 Neb. 759, 936 N.W.2d 747 (2020). His claim that he was driving poorly only because he was tired invites us to evaluate explanations and reweigh evidence, neither of which are properly a part of an appellate review of sufficiency of the evidence. See *State v. Montoya*, 304 Neb. 96, 933 N.W.2d 558 (2019). Furthermore, given the evidence in the record that Taylor admitted that his prescription medications made him "sleepy," it is not clear that evidence that Taylor was tired is even helpful to his argument that he was not impaired by his prescription medications. Finally, Taylor's general public policy argument is not relevant to the sufficiency of the evidence and, indeed, is

not even properly directed to this court. See *Rogers v. Jack's Supper Club*, 304 Neb. 605, 614, 935 N.W.2d 754, 762 (2019) ("we are not tasked with selecting what we believe is the best policy. It is the function of the Legislature, through the enactment of statutes, to declare what is the law and public policy of this state").

Viewing all of the evidence summarized above in the light most favorable to the State, we conclude that a rational trier of fact could have found beyond a reasonable doubt that Taylor's ingestion of his prescription medication had impaired to an appreciable degree his ability to operate his vehicle in a prudent and cautious manner. We therefore reject Taylor's argument that the evidence was insufficient to support his driving under the influence conviction.

## CONCLUSION

We find the district court did not err in affirming Taylor's driving under the influence conviction. We therefore affirm.

Affirmed.

Miller-Lerman, J., not participating.