IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. PROVINCE

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

JONATHAN L. PROVINCE, APPELLANT.

Filed August 13, 2024.    No. A-23-973.

Appeal from the District Court for Nance County: RACHEL A. DAUGHERTY, Judge. Affirmed.

Burke C. Brown III, of Polaris Law Group, L.L.C., for appellant.

Michael T. Hilgers, Attorney General, and Jacob M. Waggoner for appellee.

MOORE, RIEDMANN, and BISHOP, Judges.

BISHOP, Judge.

## INTRODUCTION

Following a bench trial in the Nance County District Court, Jonathan L. Province (Province) was convicted of child abuse and third degree assault. The district court sentenced him to 12 months' probation. Province appeals, claiming there was insufficient evidence to support his convictions. He also claims that there was judicial misconduct and that his trial counsel was ineffective. We affirm.

## BACKGROUND

On March 6, 2023, 11-year-old K.P. and his younger sister were playing a game when K.P. did something to hurt his sister's hand that caused her to cry. When confronted by his father, Province, K.P. lied about what happened. Then, depending on which witness was testifying, Province either "tapped," "bopped," "hit," or "punched," K.P. on the head. The next day K.P. went

- 1 -

to school and reported that his father had punched him. The school nurse examined K.P. and documented his visible injuries. Law enforcement was called, and K.P. was subsequently examined at the hospital and interviewed at the Child Advocacy Center. Province was arrested and he subsequently provided a written statement as to what happened.

On April 5, 2023, the State filed an information charging Province with two counts: count I, "Commit Child Abuse Intentionally/No Injury" pursuant to Neb. Rev. Stat. § 28-707 (Cum. Supp. 2022), a Class IIIA felony; and count II, third degree assault pursuant to Neb. Rev. Stat. § 28-310 (Reissue 2016), a Class I misdemeanor. The State later filed an amended information maintaining those charges but changing the date of the alleged offenses.

A bench trial was held on September 12, 2023. The State called several witnesses, including K.P., to testify. Province testified in his own behalf, and also called his stepmother and the child's therapist to testify on his behalf. Several exhibits were received into evidence.

K.P., 12 years old at the time of trial, is autistic. He testified that he and his sister had been playing a game and he accidently "smacked" her hand. His sister "cried and screamed." K.P. initially lied to his father about what happened between him and his sister, but then told the truth. K.P said his dad "hit" him on his head; "I thought it was a punch but it was a hit." K.P. cried and his mother came into the room. K.P. did not remember the date of the incident, but he remembered that he later talked to the school nurse and principal.

On cross-examination, K.P. was asked if his dad hit him with an open hand; he responded, "Um-hum." And when asked if his dad hit him with a closed fist, K.P. said, "No." K.P. confirmed that it hurt when he got hit. He also said that his dad kicked him. On redirect examination, K.P. said he "just remembered" that he was hit with an open hand rather than a fist. But when asked if his memory was better back when the incident happened, K.P. responded, "Um-hum."

Tammy Carlson is the elementary school principal and the K-12 coordinator of the special education program at K.P.'s school. Carlson testified that on March 7, 2023, K.P. "entered the building . . . and the minute he came through the doors, he found the first adult he could find [(a paraprofessional)] and I happened to be standing in that general area." K.P. said he was hurt and the paraprofessional "immediately turned and looked at me and I saw [K.P.'s] injuries." Carlson took K.P. to her office, and she asked Serina Bowen, the school nurse, to come to the office as well. Carlson said that "[b]ecause of the injuries being obvious from just looking at [K.P.], we did ask him what happened," and "[Bowen] did at that time . . . look at his injuries, did some assessments." Carlson was present when Bowen examined K.P.

Bowen testified that K.P. had "several injuries" on March 7, 2023, that she had not seen on March 6. K.P. had "abrasions and petechial bruising on his forehead, in his scalp, on his ear, . . . around his right eye, . . . and like on the temporal or the TMJ area." When asked whether K.P. indicated that he was hurting, Bowen replied, "He did have some pain."

Bowen did a physical examination to evaluate K.P.'s injuries, "noted them and took pictures and documentation of them." During the examination, K.P. "just blurted out . . . what had happened the night before," that "he had gotten into an argument with . . . [his sister] . . . and Dad had . . . then tried to punch him" with a "closed fist."

Bowen's charting from March 7, 2023, including photographs taken by Carlson, was received into evidence. The "Accident Info" section states:

[K.P.] stated that while playing a game last night with his sister, he "told a lie" and that made dad upset and dad "went ballistic" and punched him in the face. He tried to cover his face but thinks that he got punched two or three times. He also kicked him in the left knee. He stated that dad also picked up a full bottle of tea and threw it against the wall. Multiple compression bruising type petechia visible on right side of forehead, temple, right eye, TMJ area, ear and scalp directly proximal to the right ear. Bruising on the forehead 5 distinct areas of bruising ranging from 1/4 of inch to 2 inch in length. Forehead above right eye – circular area 1 inch in diameter. Hair Line over right eye – Two marks . . . . Right eye – Petechial bruising under the right eye, with 2 distinct marks right below the lower lid . . . . Petechia upper lid and in eye brow, bridge of the nose and outer corner of the right eye. Right Temple and TMJ area – circle area of petechial bruising . . . Right Ear – bruising of the helix and scapha area. Bruising directly behind the ear in the scalp. Right temporal triangle and apex scalp – multiple areas of bruising and abrasions. . . . Left knee – lateral aspect – no visible bruising or marks at this time.

The "Assessment" section states:

Student is reluctant at first to tell what happened, but he did, because "Mom said never to tell a lie." He said he was nervous about dad going to jail. He is forthcoming with information and answering questions. He stated that mom, dad, [sister] and Grandpa (paternal) were present when it happened. Grandma (paternal) was upstairs at the time and didn't see what happened.

(Carlson testified similarly about statements made by K.P. when he was being examined in her office.)

After Bowen finished examining K.P., Carlson called the Department of Health and Human Services' hotline and the Nance County Sheriff.

Steven Schwarz was the Nance County Chief Deputy in March 2023. Deputy Schwarz testified that on March 7 he went to the school in response to Carlson's call about suspected child abuse. Deputy Schwarz briefly spoke with K.P., who said his father hit him two or three times with a closed fist; Deputy Schwarz believed K.P.'s injuries were consistent with his report. Deputy Schwarz said that "there was no mention of anything occurring to [K.P.] except from [Province]." Deputy Schwarz also spoke with K.P.'s mother, Brittney Province (Brittney), who claimed that she knew about the incident, and had gotten into a verbal argument with Province as a result. According to Deputy Schwarz, after visiting with K.P. and Brittney, K.P. complained that "his ear was not working," so he was taken from the school to the hospital by Brittney and another law enforcement officer for a physical examination. The sheriff's office also set up an interview with the Child Advocacy Center.

Paige Cornwell, a physician assistant at the hospital, testified that she examined K.P. on March 7, 2023; her emergency room documentation from that day was received into evidence. According to the documentation, K.P. had "some superficial bruising, and excoriation/abrasions to his right lateral zygoma [(upper cheek bone)], and orbital ring," and "some mild tenderness to palpation"; "I did not find any other signs of abuse elsewhere on his body." During her testimony, Cornwell recalled that K.P. told her that he had been "'punched in the head four times.'"

Sarah Scheinost, a forensic interview specialist at the Child Advocacy Center, interviewed K.P. and his sister on March 7, 2023. The recorded interviews were received into evidence without objection. Scheinost testified that K.P. said his dad punched him with a closed fist and threw a cup of iced tea. K.P.'s sister said their dad "choked" K.P. and then punched him. Scheinost's testimony was consistent with the recorded interviews of the children. In fact, during the interview when K.P. stated that his father "punched me right here," he demonstrated with a closed fist held near the right side of his forehead. He also stated that "daddy went ballistic," meaning he was "yelling, he was mad." K.P. confirmed that the iced tea was not thrown at anyone.

Deputy Schwarz stated that he went to Province's house and tried to talk to him, but "he did not want to talk." Province was "placed under arrest and taken to the Sheriff's Office." When asked, "Did you ever Mirandize [Province] or ask him if he wanted to make a statement," Deputy Schwarz replied, "No, I did not." At some later point Province said he wanted to talk to Deputy Schwarz. "I said that time passed. If he wanted to write a written statement, it was fine and it could go with the case." Deputy Schwarz provided Province "with our standard written statement form" and Province made a written statement; the written statement was received into evidence without objection.

In the written statement, signed and dated March 7, 2023, Province wrote:

> I was playing on my PS5 when my daughter was screaming and crying because my son ([K.P.]) hurt his sister with a toy. I asked [K.P.] why . . . (his sister) was crying. He said he didn't do it. I asked him again. He said I Don't know, I did a open palm smack on his head and asked again. [H]e said he did hurt [his sister] and when I smacked his head his hand blocked some of the hand and his finger nail scratched his head. I told my wife that it was a accident and I do not like hurting my kids. She knows that I do not because I feel bad after. I was upset because my wife had a disscussion [sic] of what happened and I left the house for a hour to cool off. I came back still upset with me and my wife's disscussion [sic] and did not say a word until I went to bed. Me and my wife talked again and the rest of the night was good.

At trial, Province testified that his written statement was not accurate "due to the fact of my emotional distress at the time," He said, "I used the word [smack] instead of tap, because to me, a [smack] is different than a tap."

Province testified that on the evening of March 6, 2023, he was sitting at his desk playing a computer game with headphones on, and his daughter "made a very loud scream" that he could hear through his noise cancelling headphones. Province walked over towards the children, who were arguing. K.P.'s sister told Province that K.P. "hurt" her. Province asked K.P. three times if he hurt his sister, but K.P. denied it. "[A]fter the third time, I tapped him, went to go in to tap him to kind of wake him up." Province tried to tap the top of K.P.'s head, but K.P. "decided to put his hand up" and Province got K.P.'s hand instead. "Usually I tap with my fingers, but I went a little bit further so it was more of an open palm tap." Province explained that "[w]hen it comes to autism, [K.P.] . . . doesn't like being touched so often anymore so it kind of wakes him up, um, makes him tell the truth, gets him off of that, um, lying," "[a]nd usually when that happened, he tells the truth." Province said that "the tap is just a light tap," "[i]t's not there to harm or intimidate him." K.P.

then admitted he hurt his sister and K.P. was sent to his room for a time-out. Province denied that he hit K.P. with a closed fist and denied that he kicked K.P.

Province stated that Brittney was "a little bit upset of how I handled" the situation because "usually we don't do physicalness when it comes to the children." "She was upset that -- of the tone of voice I was using, of the high volume voice of, you know, yelling at him. And then, um me just doing the tap on him." Province tried to explain to her that "it was just a little tap." "[D]uring the heated argument," "I hit [a plastic bottle of tea] off the desk and it kind of just flew in the direction of the front door and entryway." Province was upset "that she was accusing me of doing something, you know, I didn't do," and he "left before things got too loud" between them. When Province came back 40 minutes later the children were playing and K.P. apologized for lying.

Mary Province (Mary) is Province's stepmother and K.P.'s grandmother. Mary testified that she lived in the same home as Province and his family. On March 6, 2023, Mary was making dinner and heard K.P.'s sister screaming. Mary "took a few paces away from the stove to get to where [she] could see around the corner and Dad was on it." She said that Province "was upset because [K.P.] hurt his sister and then [Province] got upset" because K.P. lied about it. According to Mary, Province gave an open-handed "bop" to the right side of K.P.'s head; "[K.P.] was just crying from being in trouble but there was no like reaction to the bop." Mary denied that Province hit K.P. with a closed fist. She said, "That did not happen at all." K.P. was then sent to his room for a time-out. Mary stated that when Province "bopped" K.P., Brittney "was a little upset about that and felt like maybe [Province] went too far." In turn, Province "was upset that [Brittney] was upset with him, so he grabbed his truck keys and went for a drive," and was gone "maybe 45 minutes." Mary did not observe any injuries to K.P. after the incident.

Mary said that a couple hours before the March 6, 2023, incident, K.P.'s sister threw a golf ball and it "beaned [K.P.] on the side of the head," and K.P. cried. Mary checked K.P. and "didn't notice any marks right instantly." And the weekend before the March 6 incident, K.P.'s sister "hit him with the -- I say a fence post but it's the flat part . . . the picket"; "I didn't see it," and "I can't even remember if I was home or Brittney was telling me, but I remember it happening." When asked if that left any damage on K.P., Mary replied, "If anything, he might have been a little red for a little bit."

Nurse Bowen was asked if the circular injury around K.P.'s temple area could have been caused by a golf ball; she replied, "It could." She also agreed that the abrasions or injuries to K.P.'s scalp could have been caused by being hit by a slab of fence. But K.P. did not report getting hit with a golf ball or a slat. Bowen testified that the circular injury by K.P.'s ear "would be the only one that I would suspect was from a circle," "the rest of [the injuries] are very linear and -- in nature and so that would not be caused by a golf ball." She also stated, "I don't know . . . if the slat would cause these because they are -- while they are linear, they are moving and flowing," "there's some curvature to them." According to Bowen, "more than one contact" caused K.P.'s injuries "because it was a widespread area," and all of the injuries noted by Bowen occurred "probably" 12 to 16 hours prior to her examination (based on skin coloring). Additionally, Deputy Schwarz did not believe K.P.'s injuries were consistent with being inflicted by a golf ball and/or a board or slat from a fence.

Chad Keezer, an independent licensed mental health practitioner, testified via telephone after it was determined he could not get "on the [video] link" provided and could not "get to a location where he [could] get onto the link . . . for at least another 30 to 40 minutes." Keezer is K.P.'s therapist. Keezer had had a "provisional license for about five years" and an "independent license for about five months." Keezer testified that regarding the incident with Province, "it seemed like there was a lot of confusion on [K.P.'s] part of what really happened." "[I]t goes from . . . bouncing on the back of his head to where he called it punching and back and forth," so "a lot of inconsistencies." Keezer's letter to the court dated August 1, 2023, was received into evidence without objection, and states in part:

> I have been working with [K.P.] since 3/13/23. [K.P.] discussed with me several times about the incident that took place between he and his dad. [K.P.] reported that he was tapped on the top of his head[] by Dad after he got into trouble with his sister. [K.P.] did not discuss being hit by a golf ball or fence slat earlier that day the first time meeting him, however, later into our sessions he did talk about his little sister throwing a golf ball at him, striking him just outside of his ear, before that his sister hit him in the face with a piece of fence from outside. [K.P.] reports that the golf ball is what was really sore.

During his testimony at trial, Keezer said that it was his understanding that K.P. had been hit by a fence panel and by a golf ball, and then Province tapped K.P. on the back of the head; "That is what I was told by the parents." According to Keezer, K.P. did not acknowledge being hit by a golf ball. Keezer said, "I have asked him about that, um, many times over since this incident happened, if he remembers getting hit by a fence panel or a golf ball" and "he says he does not know," that "[h]e does not remember that happening."

The following colloquy then took place between the district court and Keezer.

THE COURT: Okay, I do have a question. You keep bringing up the golf ball and fence post but you've testified that he's always denied that. Is that accurate, Mr. Keezer?

[Keezer]: That is accurate.

THE COURT: Okay. I'm gonna tell you that he testified today that his father hit him. I'm gonna tell you that he told the nurse during not -- during open-ended questions that his father struck him. I'm gonna tell you that he told the PA that his father struck him. I'm gonna tell you that I heard testimony of a Sheriff's Deputy that said his father struck him. I heard from a CAC interviewer today who said that [K.P.] said his father struck him. Now I have a video here that I have not yet watched.

And yet I read this letter from you, who is his therapist, who says that you talked about the pain of a golf ball who he, your client, has never told you has occurred. Is that accurate?

[Keezer]: Right, that is accurate.

THE COURT: Okay. So you -- we are -- I cannot take your testimony, nor would I accept your testimony as to any credibility of this child. That would be inappropriate for the Court to do. So is there anything beyond that that you can tell us to reflect anything that's helpful regarding this matter?

[Keezer]: Nothing more, Your Honor.

Province's counsel said that he was going to waive closing arguments because the district court had "expressed [its] anger" and Province was "worried [it] wouldn't listen" and "would get angrier." The court apologized and said it was "not trying to express anger towards [Province]," but "struggle[d]" with Keezer's statements about the golf ball. Province and the State then proceeded with closing arguments. The court asked about the child abuse charge, and intentional versus negligent acts. The State argued that the "hit, punch, slap, whatever the Court determines happened here was done intentionally." Province's counsel argued that Province "was dealing with a child who had hurt his sister," and he "certainly didn't intend to and come up and plan this." Counsel said, based on the evidence, "I don't think the felony's there," "I think it's [sic] stands with the misdemeanor." The court said it needed to review the videos, and it took the matter under advisement.

In its order entered on September 14, 2023, the district court found that the "evidence presented was largely undisputed" and "[w]hether the strike was with an open palm or a fist has no legal distinction." It pointed out that K.P. "suffered pain to his head and received an abrasion and bruising to his head." It acknowledged that it was "possible" K.P. had been struck with a golf ball, but that his injuries "as observable in the exhibits received and the testimony of the witnesses show that they were caused by more than being struck by a golf ball." The court did not find credible that K.P.'s injuries were caused by being hit with a "fence slat some five days prior"; no injuries were observed by school staff the day before the incident was reported. The court stated that Keezer "opined in essence that [K.P.] was not credible because he may have been coached by prior interviews," but the court found Keezer's opinion "to be not credible based upon the substance of the remainder of the evidence."

The district court found that "the State has proven beyond a reasonable doubt that . . . Province[] is guilty of negligently placing the minor child, [K.P.], in a situation that endangered his physical or mental health or well-being." The court further found that "the State has proven beyond a reasonable doubt that . . . Province[] recklessly caused bodily injury to another person, to wit, [K.P.]." The court therefore found Province was "guilty of Child Abuse, a Class I Misdemeanor, and Assault in the 3rd Degree, a Class I Misdemeanor." Following a hearing on November 3, 2023, the court sentenced Province to 12 months' probation, with the order further indicating that Province may be eligible to have his conviction set aside as provided in Neb. Rev. Stat. § 29-2264 (Cum. Supp. 2022) (setting aside conviction after satisfactory fulfillment of probation term and conditions).

Province appeals.

ASSIGNMENTS OF ERROR

Province assigns, reordered, (1) that there was insufficient evidence to support his convictions, (2) "judicial misconduct," and (3) "Defense Counsel was ineffective."

STANDARD OF REVIEW

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence, and such matters are for the finder of fact. *State v. Figures*, 308 Neb. 801, 957

N.W.2d 161 (2021). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *State v. Blaha*, 303 Neb. 415, 929 N.W.2d 494 (2019).

## ANALYSIS

### SUFFICIENCY OF EVIDENCE

Province argues that the evidence was insufficient to support his convictions. He was convicted of child abuse pursuant to § 28-707, and third degree assault pursuant to § 28-310.

Under § 28-707,

(1) A person commits child abuse if he or she knowingly, intentionally, or negligently causes or permits a minor child to be:

(a) Placed in a situation that endangers his or her life or physical or mental health;

(b) Cruelly confined or cruelly punished;

(c) Deprived of necessary food, clothing, shelter, or care;

. . . .

(3) Child abuse is a Class I misdemeanor if the offense is committed negligently and does not result in serious bodily injury as defined in section 28-109 or death.

(4) Child abuse is a Class IIIA felony if the offense is committed knowingly and intentionally and does not result in serious bodily injury as defined in section 28-109 or death.

(5) Child abuse is a Class IIIA felony if the offense is committed negligently and results in serious bodily injury as defined in section 28-109.

. . . .

(9) For purposes of this section, negligently refers to criminal negligence and means that a person knew or should have known of the danger involved and acted recklessly, as defined in section 28-109, with respect to the safety or health of the minor child.

Under § 28-310(1), "A person commits the offense of assault in the third degree if he: (a) Intentionally, knowingly, or recklessly causes bodily injury to another person; or (b) Threatens another in a menacing manner."

Neb. Rev. Stat. § 28-109 (Reissue 2016) provides, in relevant part, that:

(4) Bodily injury shall mean physical pain, illness, or any impairment of physical condition;

. . . .

(20) Recklessly shall mean acting with respect to a material element of an offense when any person disregards a substantial and unjustifiable risk that the material element exists or will result from his or her conduct. The risk must be of such a nature and degree

that, considering the nature and purpose of the actor's conduct and the circumstances known to the actor, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.

(21) Serious bodily injury shall mean bodily injury which involves a substantial risk of death, or which involves substantial risk of serious permanent disfigurement, or protracted loss or impairment of the function of any part or organ of the body[.]

Viewing the evidence in the light most favorable to the prosecution, we conclude there was sufficient evidence to support Province's convictions. Numerous witnesses, including Province, testified that Province's hand made contact with K.P.'s head--the fact that the descriptions of the contact varied from a "bop" to a "hit" or "punch" makes no difference since there was evidence that the contact caused K.P. pain, and was made with sufficient force to leave visible injuries as a result of the contact.

Province argues that the testimony adduced at trial "was consistent with the fact that [K.P.'s] bruising may have been caused by an incident that did not include Province's physical contact with [K.P.]," specifically a golf ball. Brief for appellant at 19. However, nurse Bowen testified that the circular injury by K.P.'s ear "would be the only one that I would suspect was from a circle," "the rest of [the injuries] are very linear and -- in nature and so that would not be caused by a golf ball." And Deputy Schwarz did not believe K.P.'s injuries were consistent with being inflicted by a golf ball and/or a board or slat from a fence. Keezer testified that K.P. did not acknowledge being hit by a golf ball. And during K.P.'s testimony, when asked if his sister threw a golf ball at him or hit him with a fence, K.P. did not remember his sister doing those things. Notably, K.P. did not mention anything about a golf ball or fence the day after the incident during his interview with Scheinost. In any event, Province's argument goes to the credibility and weight of the evidence. It is not the role of this court to resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence, as such matters are for the finder of fact. *State v. Figures, supra*. We therefore find the evidence was sufficient to support Province's convictions of misdemeanor child abuse and third degree assault.

JUDICIAL MISCONDUCT

Province assigns as error "Judicial misconduct," without specifically alleging what conduct he claims constituted judicial misconduct. See *State v. Taylor*, 310 Neb. 376, 966 N.W.2d 510 (2021) (fundamental rule of appellate practice that alleged error must be both specifically assigned and specifically argued in brief of party asserting error to be considered by appellate court; generalized and vague assignment of error that does not advise appellate court of issue submitted for decision will not be considered).

Despite the lack of specificity in the assigned error, we note that in the argument section of his brief, Province more specifically claims that the district court judge's "comments during [his] trial would likely cause a reasonable person to question her honor's impartiality" and that her "expressed anger . . . caused [him to] fear raising a defense." Brief for appellant at 15. He sets forth the exchange between the court and Keezer, along with the court's apology to Province and his counsel for the frustration expressed with Keezer's testimony. Province further claims that the

"judge's comments to Province's witness [Keezer] expressed anger and bias" and the "Due Process Clause requires that legal proceedings be conducted in a fair and impartial matter." *Id*. at 16-17.

It is true that "[t]he right to an impartial judge is guaranteed under the Due Process Clause of the 14th Amendment to the U.S. Constitution and the due process clause of the Nebraska Constitution, the parameters of which are coextensive." *State v. Thomas*, 268 Neb. 570, 579, 685 N.W.2d 69, 78 (2004). Province also refers to *State v. Pattno*, 254 Neb. 733, 579 N.W.2d 503 (1998), for the proposition that a judge's comments which appear to be based upon bias or prejudice, and which would cause a reasonable person to question the judge's impartiality, may be grounds for recusal. In *State v. Pattno, supra*, the Nebraska Supreme Court vacated a sentence and remanded for resentencing because the trial judge interjected his own religious views immediately prior to sentencing by reading a passage "from the Bible . . . which disparaged homosexuality and, therefore, manifested bias against [the defendant] because of his sexual orientation." *Id*. at 734, 579 N.W.2d at 505.

A defendant seeking to disqualify a judge on the basis of bias or prejudice bears the heavy burden of overcoming the presumption of judicial impartiality. *Id*. A judge shall be disqualified if a reasonable person who knew the circumstances of the case would question the judge's impartiality under an objective standard of reasonableness, even though no actual bias or prejudice was shown. See *id*. Trial before a judge who is not impartial may constitute structural error, meaning an error so "'affecting the framework within which the trial proceeds,' . . . that they demand automatic reversal." *State v. Bjorklund*, 258 Neb. 432, 504, 604 N.W.2d 169, 225 (2000) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991)). The test is whether the defendant can show that the judge was put in a situation which might lead him or her "not to hold the balance nice, clear and true between the State and the accused." *State v. Ryan*, 257 Neb. 635, 654-55, 601 N.W.2d 473, 488 (1999) (internal quotations omitted).

We see no constitutional due process violation in the district court's questions or comments made during the course of trial in this case. We agree with the State that the court was "not demonstrating bias, but was questioning the credibility of a witness, its job as the trier of fact." Brief for appellee at 16. The questions asked and the comments made by the district court judge during this bench trial when evaluating the credibility of Keezer could not cause a reasonable person to question the judge's impartiality. Rather, it is evident from the record that the trial judge was troubled by the contradictions between Keezer's testimony and the letter he wrote that was received as an exhibit. Keezer testified that K.P. denied anything about a golf ball or fence post, yet the letter he wrote to the court indicated that K.P. "later into our sessions" talked about his sister throwing a golf ball at him near his ear and that it "was really sore," and "before that his sister hit him in the face with a piece of fence from outside." During Keezer's testimony, he also suggested that K.P.'s autism might cause his "anxiety [to] go up and he may tell more of a story than maybe that was there. Um, you know, he -- he, um, may call that a punch when maybe it was not." Keezer was asked by defense counsel, "If [K.P.] testified today and had a lack of memory about what he originally said, would you expect that out of [K.P.] as an autism concern[?]" Keezer responded, "I do, I do. . . . [I]t kind of goes . . . along with that golf ball and the fence panel thing. . . . he's very consistent on that but he may say things like 'I don't remember.'" It was at this point that the trial judge said, "You keep bringing up the golf ball and fence post but you've testified that he's always denied that. Is that accurate, Mr. Keezer?" Keezer replied, "That is accurate." The

court then described the testimony of other witnesses who reported that K.P. said his father struck him. The court confirmed that Keezer, as K.P.'s therapist, indicated in his letter that he and K.P. "talked about the pain of a golf ball" when K.P. "has never told you [that] has occurred. Is that accurate?" Keezer responded, "Right, that is accurate."

The inquiry from the district court, which may have expressed frustration, merely fleshed out the inconsistency between Keezer's testimony and the letter he wrote. The court further properly stated that Keezer's testimony could not be used to impact the credibility of K.P. See *State v. Rocha*, 295 Neb. 716, 890 N.W.2d 178 (2017) (credibility of witnesses is determination within province of trier of fact; it is improper for witness to testify whether another person may or may not have been telling truth in specific instance). None of the court's questions or comments indicated any bias or prejudice towards the defendant, the witnesses, or the attorneys.

Further, to the extent that Province suggests the trial judge should have recused herself, Province has waived this issue by failing to request the judge's recusal. See *State v. McHenry*, 268 Neb. 219, 682 N.W.2d 212 (2004) (defendant who is aware of reason for recusal waives issue of whether judge should have recused himself or herself when defendant fails to request judge's recusal.)

## INEFFECTIVE ASSISTANCE OF COUNSEL

Province's appellate counsel is different from his trial counsel. He assigns as error that "Defense Counsel was ineffective." He argues but did not specifically assign that trial counsel was ineffective by failing to file a motion to suppress his written statement, failing to support Keezer's "trustworthiness" and failing to clarify the "golf ball incident," failing to call Province's wife to testify, and refusing to review with Province the "body cam footage and the interview video." Brief for appellant at 14-15.

When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020).

An ineffective assistance of counsel claim is raised on direct appeal when the claim alleges deficient performance with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to recognize whether the claim was brought before the appellate court. *State v. German*, 316 Neb. 841, 7 N.W.3d 206 (2024). When a claim of ineffective assistance of counsel is raised in a direct appeal, the appellant is not required to allege prejudice; however, an appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel. *Id.*

In *State v. Mrza*, 302 Neb. 931, 935, 926 N.W.2d 79, 86 (2019), the Nebraska Supreme Court stated, "We now hold that assignments of error on direct appeal regarding ineffective assistance of trial counsel must specifically allege deficient performance, and an appellate court will not scour the remainder of the brief in search of such specificity."

Province's assignment of error only generally alleged that "[d]efense [c]ounsel was ineffective." There is no specific allegation of deficient performance set forth in the assigned error. Therefore, even though Province more particularly describes the alleged deficiencies in the

argument section of his brief, his failure to allege such deficiencies in the "Assignments of Error" section of his brief does not meet the requirement established by *Mrza, supra*. We therefore do not consider Province's assignment of error alleging ineffective assistance of trial counsel. See *State v. Price*, 306 Neb. 38, 944 N.W.2d 279 (2020) (ineffective assistance of counsel claim not considered when assigned error did not specify counsel's deficient performance, even though argument section of brief discussed claims in detail).

## CONCLUSION

For the reasons stated above, we affirm Province's convictions.

AFFIRMED.