IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

In the Matter of the Guardianship of:

A.K., *A Minor/Real Party in Interest*.

No. 1 CA-CV 23-0485

FILED 08-27-2024

Appeal from the Superior Court in Maricopa County
No. JG512607
The Honorable Amanda S. Chua, Judge *Pro Tempore* (retired)
The Honorable Todd F. Lang, Judge

## VACATED AND REMANDED

COUNSEL

Center for the Rights of Abused Children, Phoenix
By Tom Jose (argued), Timothy D. Keller, and Keila Urbach
*Counsel for Appellants*

Denise L. Carroll, Esq., Scottsdale
By Denise L. Carroll (argued)
*Counsel for Real Party in Interest*

Gila River Indian Community Office of General Counsel, Sacaton
By Javier Ramos and Sunshine Manuel
*Co-Counsel for Appellee*

Rothstein Donatelli LLP, Tempe
By April E. Olson (argued) and Wouter Zwart
*Co-Counsel for Appellee*

Lisa M. Jones, Algonquinn, IL
*Amicus Curiae*

Scharf-Norton Center for Constitutional Litigation at the Goldwater
Institute, Phoenix
By Timothy Sandefur
*Counsel for Amicus Curiae Goldwater Institute*

Tohono O'odham Nation Office of Attorney General, Sells
By Howard M. Shanker, Kanani S. Anderson, Rebecca Cohen, and
Marissa Sites
Navajo Nation Department of Justice, Window Rock
By Ethel Branch and Sage G. Metoxen
*Co-Counsel for Amici Curiae Tohono O'odham Nation and Navajo Nation*

Indian Legal Clinic, Phoenix
By Patty Ferguson Bohnee
*Counsel for Amicus Curiae Native American Bar Association*

---

**OPINION**

---

Presiding Judge Paul J. McMurdie delivered the Court's opinion, in which
Judge Maria Elena Cruz joined. Judge Cynthia J. Bailey concurred in part
and dissented in part.

---

**M c M U R D I E**, Judge:

¶1 Appellants Daisy and Jake Danforth ("Danforths") appeal the
superior court's dismissal of their guardianship petition for a minor child,
Allie.[1] The Danforths argue that the superior court erred by summarily
dismissing their petition because the Gila River Indian Community
("Community") did not have exclusive jurisdiction over the guardianship
proceeding. The Danforths also contend that the summary dismissal
violated their due process rights. The Community asserts that the superior
court did not violate due process, and it had exclusive jurisdiction under
the Indian Child Welfare Act ("ICWA") because Allie was a ward of its
court.

---

[1] We use a pseudonym to protect the child's identity.

**¶2** We hold that ICWA applies to this guardianship proceeding as a preadoptive placement but that the superior court erred by summarily dismissing the proceeding because the Community did not have exclusive jurisdiction under the Act. We remand the case to allow the superior court to determine whether to transfer the matter to the Community's Children's Court. *See* Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38778, 38822 (June 14, 2016) (to be codified at 25 C.F.R. pt. 23) ("Parties may request transfer of preadoptive and adoptive placement proceedings, but the standards for addressing such motions are not dictated by ICWA or these regulations."). If the superior court elects to retain jurisdiction of the guardianship petition, it must follow the preadoptive placement preferences for Indian children under 25 U.S.C. § 1915(b), absent good cause to the contrary. *See* 25 U.S.C. § 1915(b); *Gila River Indian Cmty. v. Dep't of Child Safety*, 238 Ariz. 531, 534, ¶ 11 (App. 2015).

**¶3** The majority and dissent agree on most of the issues in this case. We agree that the superior court violated the Danforths' due process rights by not allowing them to brief the ICWA jurisdictional issue. We also agree that the guardianship proceeding here is not an "adoptive placement," "foster care placement," or "termination of parental rights" under 25 U.S.C. § 1903(1). We part ways on whether the guardianship proceeding is a "preadoptive placement" under 25 U.S.C. § 1903(1). And the sole disagreement comes down to interpreting "foster home."

**¶4** The majority interprets foster home broadly to effectuate ICWA's attempt "to protect and preserve the integrity of America's Indian tribes, while also protecting the interests of Indian children." *Steven H. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 566, 570, ¶ 12 (2008); *see* 25 U.S.C. § 1902. This interpretation allows the superior court on remand to exercise jurisdiction to adjudicate the Danforths' guardianship petition but requires the court to consider ICWA's placement preferences. Our dissenting colleague concludes that the Danforths are not a foster home, leading to the conclusion that ICWA does not apply and the Community should be relegated to an ordinary intervenor. *See* Ariz. R. Civ. P. 24. Because the narrow interpretation does not give the Community or ICWA the deference due, the majority rejects it.

## FACTS AND PROCEDURAL BACKGROUND

**¶5** Allie was born in Phoenix in 2010. In 2012, she became an enrolled member of the Community. The Community terminated Allie's biological parent's rights, and in 2014, Karen Kurtz adopted Allie in the Community's Children's Court. In April 2023, Kurtz died in Chandler.

¶6          In May 2023, the Danforths petitioned the superior court to be appointed Allie's guardians. The court set a Title 14 guardianship hearing[2] and appointed a guardian ad litem. In July 2023, the Danforths filed a notice of Allie's tribal enrollment. The Community moved to intervene under 25 U.S.C. § 1911(c), which the court granted.

¶7          The court began a guardianship hearing on July 20, 2023. At the hearing, the Community asked that the case be dismissed and "just proceed forward in the Gila River Courts." The court denied the request, stating, "it seems like [the case will] be in limbo if we dismissed [at] this time." Instead, the court continued the hearing to the next week.

¶8          Meanwhile, on July 24, Tribal Social Services started proceedings in the Community's Children's Court.[3] Tribal Social Services alleged that Allie needed care under the Gila River Indian Community Children's Code ("Children's Code") Section 7.103(A)(11)(a), which applies when a "child has no parent, guardian or custodian available or willing to provide care for them[.]" Tribal Social Services represented that "the minor is possibly with individuals Daisy and Jake Danforth in [Perrysburg], Ohio, no background or home study/assessment has not been completed for Mr. and Mrs. Danforth." It alleged, "Due to the adoptive mother being deceased and no father involved, and rights of the biological mother being terminated there are no parents or guardians available to provide care for the minor at this time." Under the risk assessment heading, Tribal Social Services checked "[a]bandonment." The hearing request form did not notify the Community's Children's Court that the Danforths petitioned for guardianship of Allie or that a proceeding was pending in state court.

¶9          The Community's Children's Court entered a temporary order making Allie a ward of its court. The order stated that "Tribal Social Services alleges the parent is in violation of Section(s): 7.103.A.11(a) of the Children's Code," and it found that "returning the Minor(s) to the home of their parent/guardian [would] pose an imminent risk of harm to the minor's safety and well-being." The Community's Children's Court

_____

[2]          Proceedings arising under Arizona Revised Statutes Title 14 are probate proceedings, Ariz. R. Prob. P. 3(c)(1), governed by the Arizona Rules of Probate Procedure, Ariz. R. Prob. P. 1(a). "The Civil Rules apply to probate proceedings unless they are inconsistent with these probate rules or A.R.S. Title 14." Ariz. R. Prob. P. (4)(a)(1).

[3]          The tribal cause number is JC-2023-0137.

provided the Protective Services Office two days to file a Child in Need of Care Petition.

¶10 The Protective Services Office petitioned in the Community's Children's Court the next day, stating it had subject matter jurisdiction in "Child in Need of Care matters" and personal jurisdiction over Allie. It alleged that Allie was a "Child in Need of Care" because "two individuals from the adoptive mother's church [had taken] the Minor to the Perrysburg, Ohio area without notifying the Community[,] [and] CPS ha[d] been unable to see the child to assess her safety and these two individuals ha[d] not been vetted by CPS."[4] *See* Children's Code § 7.103(A)(11)(a) (A "Child in Need of Care" is one who "has no parent, guardian or custodian available or willing to provide care for them."). The petition again did not mention that the Danforths petitioned for guardianship of Allie, and a proceeding was pending in state court. The Community's Children's Court amended its temporary ward order to keep it "in effect pending final adjudication." (Emphasis omitted.)

¶11 On July 27, 2023, the morning of the continued state guardianship hearing, the Community filed with the superior court the temporary order adjudicating Allie a ward of the Community's Children's Court and its protective custody warrant for Allie. The Community's notice of filing in the superior court stated, "the Community requests the Court to take notice of the Community's jurisdiction over the Minor, who was legally removed by Tribal Social Services" three days earlier.

¶12 The continued superior court guardianship hearing took place the same morning. The guardian ad litem was absent at the hearing because he waived his presence, and the court stated it "knew" his position. But when the guardian ad litem waived his presence, he had no notice of the Community's Children's Court temporary order adjudicating Allie a ward of that court or of the superior court's position that the superior court guardianship proceeding should be dismissed for lack of jurisdiction. The court said it had reviewed the Community's notice before the hearing. The court noted that "the child has been taken by the Gila Indian River Community . . . there was a custody warrant, and they're now in their care." The court stated, "[I]t's really been taken out of our hands. . . . The Gila

---

[4] At the Community's Children's Court hearing on July 28, 2023, after the superior court dismissed the case, Tribal Social Services described the situation with less concern: "the minor is staying with family friends in Ohio."

Indian River Community has taken temporary custody of the child and so we no longer have jurisdiction in Maricopa County Court."

¶13       The Danforths objected to the dismissal and requested that the court enter a temporary guardianship and order that Allie not be removed from them. They argued that removal would not be in Allie's best interests and that the parties should be able to brief the jurisdictional issue. The court responded:

> [W]e have lost jurisdiction. What I have here is that there is a -- this child is now a temporary ward with the Community Children's Court. And there is a warrant. And so without -- in this situation -- the way these Title 14 guardianships occur is usually there is a consent from a parent. We have no parent. But we do have a tribe.
>
> And so that -- this is the situation that we have here right now. So I don't want to keep it here in this court when it looks like it can move forward in a different one.

¶14       The superior court noted in its final dismissal order that it was "not aware of any Arizona cases on point" but that "a decision by the Montana Supreme Court [was] illustrative." *See In re Parental Placement of M.R.D.B.*, 241 Mont. 455 (1990). The court found that because Allie was a ward of the Community's court, it no longer had jurisdiction over the matter as the Community had exclusive jurisdiction under 25 U.S.C. § 1911(a), and Section 1911(d) required the superior court to give full faith and credit to the Community's judicial proceedings. The superior court dismissed the guardianship petition.

¶15       The Danforths appealed, and we have jurisdiction under A.R.S. § 12-2101(A)(1), (9).

## DISCUSSION

### A.    The Superior Court Violated the Danforths' Due Process Rights when It Dismissed the Guardianship Petition.

¶16       "We review constitutional questions, including compliance with due process, *de novo*." *Ariz. Dep't of Transp. v. Ariz. Motor Vehicle, LLC*, 255 Ariz. 139, 142, ¶ 14 (App. 2023).

¶17       The Danforths argue that the superior court's premature dismissal violated their "due process right to be heard in a meaningful

manner." They assert that the court denied them due process by failing to hold an evidentiary hearing on jurisdiction and making incorrect factual findings in its final dismissal order.

**¶18** Under the United States Constitution, no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Similarly, in Arizona, "[n]o person shall be deprived of life, liberty, or property without due process of law." Ariz. Const. art. 2, § 4. "The touchstone of due process under both the Arizona and federal constitutions is fundamental fairness." *Jeff D. v. Dep't of Child Safety*, 239 Ariz. 205, 207, ¶ 7 (App. 2016) (quoting *State v. Melendez*, 172 Ariz. 68, 71 (1992)). And the "fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). "Due process is flexible and calls for such procedural protections as the particular situation demands." *Samiuddin v. Nothwehr*, 243 Ariz. 204, 211, ¶ 20 (2017) (cleaned up) (quoting *Mathews*, 424 U.S. at 334). Still, due process requires that parties have an adequate opportunity to present factual and legal claims fully. *See Kessen v. Stewart*, 195 Ariz. 488, 492, ¶ 16 (App. 1999).

**¶19** At the July 27 guardianship hearing, the superior court *sua sponte* dismissed the Danforths' guardianship proceeding. Just before the hearing, the Community filed with the superior court its court's order adjudicating Allie a temporary ward of the Community's Children's Court and its protective custody warrant for Allie. Its notice of filing read, "the Community requests the Court to take notice of the Community's jurisdiction over the Minor, who was legally removed by Tribal Social Services" three days earlier. But the Community never moved to dismiss, nor did it make an oral motion at the July 27 hearing. Rather, the court, on its own, informed the parties that "this petition is going to be dismissed." The Danforths objected, quickly argued their position, and asked the court for a chance to brief the issue. But the court refused, stating it no longer had jurisdiction and dismissed the case.

**¶20** A court violates a litigant's due process rights if it affords the party no meaningful opportunity to be heard. *See Mathews*, 424 U.S. at 333; *see also Tracy D. v. Dep't of Child Safety*, 252 Ariz. 425, 434-35, ¶¶ 33, 40 (App. 2021) (The court mentioned factors to determine what process is due to preserve a meaningful opportunity to be heard.). We acknowledge that the due process rights of potential guardians are less than those of birth or adoptive parents. *See Jeff D.*, 239 Ariz. at 208, ¶ 8 ("[A] challenge by foster parents to a dependent child's placement does not implicate the same

fundamental liberty interests [as those of birth parents].”). Still, the Danforths were a party to the action and should have been heard on the legal issue. *Cf. id.* at 209, ¶ 14 (The court “allowed Foster Parents to intervene on the placement issue and considered the written reports they submitted and argument by their counsel.”); *Kessen*, 195 Ariz. at 490, 492-93, ¶¶ 3, 16-17 (The court satisfied due process by considering the parties’ memoranda on the legal issue.).

¶21        We reject the Community’s argument that the court provided sufficient process before dismissing the case because “it held a hearing on jurisdiction on July 27, heard argument from the Danforths and the Community, and had the relevant facts before it (the Ward Order).” The court’s hearing was scheduled for the guardianship petition, not an argument about the jurisdictional issue. And without notice, the Danforths could not meaningfully argue that the superior court had jurisdiction over the case. The court erred by not allowing the Danforths to be heard fully on the jurisdictional issue.

¶22        That is not to say the Danforths were entitled to an evidentiary hearing.[5] A court must hold an evidentiary hearing when “resolution of a material contested issue hinges on credibility.” *See Volk v. Brame*, 235 Ariz. 462, 466, ¶ 14 (App. 2014). Likewise, if the parties “are directly in opposition upon any substantial and crucial fact relevant [to the issue] . . . . the court must hold a hearing.” *Pridgeon v. Superior Court*, 134 Ariz. 177, 181 (1982); *see also* Ariz. R. Prob. P. 23(a) (An “evidentiary hearing” allows the parties to “present evidence for a determination of factual issues.”). The Danforths rely on *Goldberg v. Kelly* for the proposition that “[i]n almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses.” 397 U.S. 254, 269 (1970).

¶23        The Danforths claim that the superior court’s dismissal order included contested factual findings entitling them to an evidentiary hearing. For example, the court found that Kurtz was Allie’s grandmother and a tribal member, which the Danforths argue are contested facts that lack record support. The Danforths also argue that there was confusion about Allie’s whereabouts and domicile.

---

[5]        At oral argument here, the Danforths conceded that for the jurisdictional consideration no other facts were necessary.

¶24 Although the court made unsupported factual findings, the parties did not take opposing positions on those facts. Neither the Danforths nor the Community asserted that Allie's adoptive Mother, Kurtz, was her grandmother. Nor did they assert Kurtz was a tribal member. Both parties' briefs before this court describe Kurtz as a non-tribal member. Similarly, the record does not show that Allie's domicile was a contested fact. Because the parties do not offer material, conflicting facts that inform jurisdiction, the Danforths were not entitled to an evidentiary hearing. *See Pridgeon*, 134 Ariz. at 181. The erroneous factual findings were harmless.

¶25 The Danforths also rely on Title 14 statutory requirements and the Arizona Rules of Probate Procedure to argue they were entitled to an evidentiary hearing. But they conflate the right to a hearing on the petition with the right to an evidentiary hearing. They note that those who petition for guardianship of a child under Title 14 are entitled to a hearing date. *See* A.R.S. § 14-5207(A). If certain conditions are met, the court "shall make the [guardianship] appointment." A.R.S. § 14-5207(B). But the statute also states, "In other cases the court may dismiss the proceedings." *Id.* Further, a party is not entitled to an evidentiary hearing separate from the initial hearing under the statute or the Arizona Rules of Probate Procedure. *See* A.R.S. § 14-5207; Ariz. R. Prob. P. 23(b). Here, the court scheduled a hearing date but dismissed the proceeding based on a lack of jurisdiction. The court thus complied with the statutory requirements. *See* A.R.S. § 14-5207(A), (B).

¶26 Although the Danforths were not entitled to an evidentiary hearing, they were entitled to an opportunity to be heard on the legal issue. The superior court violated their due process rights by denying them that opportunity. But "[d]ue process errors require reversal only if a party is thereby prejudiced." *Volk*, 235 Ariz. at 470, ¶ 26. We examine below whether the Danforths were prejudiced when the superior court denied the Danforths a meaningful opportunity to be heard and found that the Community had exclusive jurisdiction.

**B. ICWA Applies to This Guardianship Proceeding, but the Community Did Not Have Exclusive Jurisdiction.**

¶27 We review *de novo* legal issues, including statutory interpretation questions and whether the superior court had jurisdiction. *Holly C. v. Tohono O'odham Nation*, 247 Ariz. 495, 505, ¶ 26 (App. 2019); *see also Duwyenie v. Moran*, 220 Ariz. 501, 503, ¶ 7 (App. 2009). "To the extent a court's jurisdictional determination rests on disputed facts, however, we accept the court's findings if reasonable evidence and inferences support

them." *Holly C.*, 247 Ariz. at 505, ¶ 26. "Our role when deciding jurisdictional issues under ICWA is to decide '*who* should make the custody determination concerning the child—not what the outcome of that determination should be.'" *Michael J., Jr. v. Michael J., Sr.*, 198 Ariz. 154, 156, ¶ 7 (App. 2000) (cleaned up) (quoting *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 53 (1989)).

### 1. ICWA Applies to This Guardianship Proceeding.

**¶28** In 1978, Congress enacted ICWA "out of concern that 'an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies.'" *Haaland v. Brackeen*, 599 U.S. 255, 265 (2023) (quoting 25 U.S.C. § 1901(4)). ICWA reflects congressional concern "not solely about the interests of Indian children and families, but also about the impact on the tribes themselves." *Holyfield*, 490 U.S. at 49. In response, "ICWA provide[d] a dual jurisdictional scheme over Indian child custody proceedings." *Gila River Indian Cmty. v. Dep't of Child Safety*, 242 Ariz. 277, 280, ¶ 12 (2017). The purpose of ICWA is "to protect and preserve the integrity of America's Indian tribes, while also protecting the interests of Indian children." *Steven H.*, 218 Ariz. at 570, ¶ 12; *see also* 25 U.S.C. § 1902.

**¶29** When analyzing ICWA, "[W]e attempt to give effect to the will of Congress as expressed in the statutory language, which we construe liberally in favor of the interest in preserving tribal families." *Gila River Indian Cmty.*, 242 Ariz. at 280, ¶ 11 (citations omitted). But we "will not look beyond the clear meaning of express statutory terms unless a literal interpretation would thwart the purpose of the statutory scheme or lead to absurd results." *Id.* (citations omitted).

**¶30** We must determine whether ICWA applies here because, if it does not, the superior court erred by dismissing the case based on the Community's alleged exclusive jurisdiction under the Act. To invoke ICWA, the proceeding at issue must be a "child custody proceeding" about an Indian child. *Maricopa County Juv. Action No. A-25525*, 136 Ariz. 528, 531 (App. 1983); *see* 25 U.S.C. § 1903(1), (4); *see also Michael J.*, 198 Ariz. at 158, ¶ 16.

**¶31** Allie is an Indian child. The record supports that she is a Gila River Indian Community member and the biological child of a tribal member. *See* 25 U.S.C. § 1903(4). Thus, this element required for ICWA's application is satisfied. *See id.*; *see also* 25 U.S.C. § 1911(d) (We give full faith and credit to an Indian tribe's records.).

¶32       We must now determine whether this Title 14 guardianship proceeding is a "child custody proceeding." *See* 25 U.S.C. § 1903(1). ICWA delineates "child custody proceedings" into four categories: foster care placement, termination of parental rights, preadoptive placement, and adoptive placement. 25 U.S.C. § 1903(1)(i)-(iv); *see also Gila River Indian Cmty.*, 242 Ariz. at 280, ¶ 12. The Act defines each proceeding as follows:

> (1) "child custody proceeding" shall mean and include--
>
> > (i) "foster care placement" which shall mean any action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated;
> >
> > (ii) "termination of parental rights" which shall mean any action resulting in the termination of the parent-child relationship;
> >
> > (iii) "preadoptive placement" which shall mean the temporary placement of an Indian child in a foster home or institution after the termination of parental rights, but prior to or in lieu of adoptive placement; and
> >
> > (iv) "adoptive placement" which shall mean the permanent placement of an Indian child for adoption, including any action resulting in a final decree of adoption.

25 U.S.C. § 1903(1)(i)-(iv). The statute is silent on guardianship proceedings. *See id.*

¶33       The Danforths argue that the facts of this Title 14 guardianship proceeding show the case does not fall into any of ICWA's "child custody proceeding" categories, a requirement for ICWA's application. *See* 25 U.S.C. § 1903(1); *Maricopa County Juv. Action No. A-25525*, 136 Ariz. at 531. The Community argues the proceeding falls under ICWA as a "foster care placement" or "termination of parental rights." *See* 25 U.S.C. § 1903(1)(i), (ii). The Community also argues that the definition of "child custody proceeding" is "expansive and not limited to the four

enumerated examples" because Section 1903 uses the term "include" before listing the four succeeding categories. *See* 25 U.S.C. § 1903(1).

¶34 The Community is correct that "include" is "ordinarily a term of enlargement, not of limitation." *See Sec. Sav. & Loan Ass'n v. Milton*, 171 Ariz. 75, 77 (App. 1991). But "include" does not stand alone here; it is coupled with the phrase "shall mean." 25 U.S.C. § 1903(1); *see also Am. Sur. Co. of New York v. Marotta*, 287 U.S. 513, 517 (1933) (interpreting "shall mean" as "to enumerate and restrict"). And the Code of Federal Regulations clarifies the import of "shall mean and include" in this context. *See* 25 C.F.R. § 23.2. That is, "Child-custody proceeding means and includes any action, other than an emergency proceeding, that may culminate in one of the following outcomes: [foster care placement, termination of parental rights, preadoptive placement, or adoptive placement]." *Id.* (internal quotations omitted). Thus, here, the term "include" leaves open the types of actions that qualify as a "child custody proceeding" so long as they lead to one of the four listed outcomes in 25 U.S.C. § 1903(1). *See, e.g., Navajo Nation v. Dep't of Child Safety*, 246 Ariz. 463, 467, ¶ 13 (App. 2019).

¶35 The Community asks that we instead hold that ICWA applies whenever there is an Indian child, the proceeding is about custody, and neither of the two explicit exceptions apply. *See* 25 U.S.C. § 1903(1). Because that interpretation would render Section 1903(1)'s "child custody proceeding" definition superfluous, we do not adopt it. *See id.*; *see also Comanche Indian Tribe of Oklahoma v. Hovis*, 53 F.3d 298, 302 (10th Cir. 1995) ("ICWA specifically defines which 'child custody proceedings' are within its purview."); *Nicaise v. Sundaram*, 245 Ariz. 566, 568, ¶ 11 (2019) ("A cardinal principle of statutory interpretation is to give meaning, if possible, to every word and provision so that no word or provision is rendered superfluous.").

¶36 The question thus remains whether this Title 14 guardianship proceeding is one of the four "child custody proceedings" defined by ICWA. *See* 25 U.S.C. § 1903(1). The Community argues that ICWA applies here because when the Danforths "took [Allie] out of Arizona without legal authority, they converted this case into a dependency proceeding" under Title 8. We find no legal support for this assertion and reject it. The Community also argues that "[the Department of Child Safety] could have filed a dependency petition and this Title 14 proceeding[] would have become a Title 8 proceeding." But the Department of Child Safety ("DCS") never began such an action. And although the Community describes its Tribal Social Services as DCS's "counterpart," its involvement did not convert the state proceeding from a Title 14 to a Title 8 action.

¶37     The Community also relies on *In re Guardianship of M.G.* for the proposition that "[w]hen a deceased parent has made no arrangements for a guardian and no person has come forward seeking guardianship under A.R.S. § 14-5207(A), the case is one for dependency under [Title 8]." *See* 250 Ariz. 501, 503, ¶ 9 (App. 2021). But the Danforths did come forward and sought guardianship under A.R.S. § 14-5207(A). Thus, this case is a Title 14 proceeding, and we analyze it as one.

¶38     Arizona has not decided whether Title 14 guardianship proceedings are "child custody proceedings."[6] But in 2019, this court held that Title 8 guardianships are "foster care placement" proceedings under ICWA. *Navajo Nation*, 246 Ariz. at 467, ¶ 13. In *Navajo Nation*, we held that "ICWA does not explicitly recognize 'permanent guardianships,'" but "a comparison of Arizona's statute for permanent guardianship and ICWA's definition for a 'foster care placement' shows that ICWA applies in permanent guardianships." *Id.*; *see also* A.R.S. § 8-872. The court reasoned:

> ICWA provides that a "foster care placement" involves (1) a child being placed in a guardian's home, (2) a parent's inability to demand custody, and (3) non-termination of the parent's rights. 25 U.S.C. 1903(1)(i). Likewise, Arizona's permanent guardianship statute involves (1) a child placed with a guardian, (2) a parent's loss of custody, and (3) non-termination of the parent's rights. A.R.S. § 8-872(h). Therefore, based on the statutes' plain language, ICWA applies to Arizona's permanent guardianship proceedings.

*Navajo Nation*, 246 Ariz. at 467, ¶ 13.

¶39     The Danforths' guardianship petition is under Title 14, not Title 8.[7] In a Title 14 guardianship proceeding, the court may appoint the

---

6       At least one jurisdiction has enacted legislation directing that ICWA applies to their state's guardianship proceedings. *See Guardianship of D.W.*, 164 Cal. Rptr. 3d 414, 419 (App. 2013); Cal. Prob. Code § 1459.5 (West 2007). Arizona has not.

7       *Compare* A.R.S. § 14-5207(A) (Title 14 allows "[a]ny person interested in the welfare of a minor" to "petition the court for appointment of a guardian."), *with* A.R.S. §§ 8-871, -872 (Title 8 motions for permanent guardianship are limited to those who are a "party to a dependency proceeding or a pending dependency proceeding.").

13

person seeking guardianship only if "all parental rights of custody have been terminated or suspended by circumstances or prior court order." A.R.S. §§ 14-5204, -5207(B). Thus, a Title 14 guardianship proceeding could exist where parental rights have been terminated. *See id.* But ICWA's "foster care placement" definition requires that "parental rights have not been terminated." 25 U.S.C. § 1903(1)(i). Thus, on its face, Title 14's guardianship statute conflicts with ICWA's "foster care placement" definition, and we cannot extend *Navajo Nation* to Title 14 guardianship proceedings. *See* 246 Ariz. at 467, ¶ 13.

**¶40** Based on the facts, ICWA's "foster care placement" does not apply. *See* 25 U.S.C. § 1903(1)(i). First, the "foster care placement" definition contemplates inapplicable persons and events. It is an action "removing an Indian child from its parent or Indian custodian." *Id.* The instant proceeding would not "remove" Allie from a parent or Indian custodian, mainly because there is no person to "remove" Allie from. The Danforths petitioned for guardianship because Allie's adoptive parent, Kurtz, passed away. Thus, the petition's purpose was not to remove Allie from anyone. And even if the proceeding were a removal, it is not a removal from a "parent or Indian custodian." *See id.* The statute defines "parent" as "any biological parent or parents of an Indian child or any Indian person who has lawfully adopted an Indian child." *Id.* § 1903(9). And it limits an "Indian custodian" to an "Indian person." *Id.* § 1903(6). But Kurtz was not Allie's biological parent, nor was she an Indian person.[8] *See* 25 U.S.C. § 1903(1)(i), (6), (9).

**¶41** The "foster care placement" definition also requires that "parental rights have not been terminated." 25 U.S.C. § 1903(1)(i). But all rights between Allie and any possible parent have been terminated. The Community terminated Allie's biological mother's rights in tribal court before July 2014. And Kurtz's parental rights ended when she died. *See In re Guardianship of M.G.*, 250 Ariz. at 502, 503, ¶¶ 1, 8 ("Mother's parental rights terminated when she died, thereby satisfying § 14-5204's condition that 'all parental rights of custody have been terminated.'"); A.R.S.

---

[8]     Although the superior court found that Kurtz was an Indian person, we do not defer to this finding because reasonable evidence and inferences do not support it. *See Holly C.*, 247 Ariz. at 505, ¶ 26. Both parties assert that Kurtz was not an Indian person and there is no record evidence otherwise.

§ 14-5204. Thus, this guardianship proceeding fails to satisfy ICWA's "foster care placement" elements.[9] *See* 25 U.S.C. § 1903(1)(i).

**¶42**    Because this guardianship proceeding is not a "foster care placement," ICWA only applies if the proceeding results in a "termination of parental rights," "preadoptive placement," or "adoptive placement." *See* 25 U.S.C. § 1903(1). This guardianship proceeding is neither a "termination of parental rights" nor an "adoptive placement" proceeding. *See* 25 U.S.C. § 1903(1)(ii), (iv). It is not a "termination of parental rights" proceeding because it would lead to a guardianship appointment, not the termination of any relationship. *See id.* § 1903(1)(ii); A.R.S. § 14-5204. Likewise, this proceeding is not an "adoptive placement" because it would lead to a guardianship appointment, not a final adoption decree. *See* 25 U.S.C. § 1903(1)(iv); A.R.S. §§ 14-5204, -5209.

**¶43**    To determine whether this guardianship proceeding is a "preadoptive placement," we must determine whether it functions as "the temporary placement of an Indian child in a foster home or institution after the termination of parental rights, but prior to or in lieu of adoptive placement." *See* 25 U.S.C. § 1903(1)(iii).

**¶44**    The Danforths contend that this is not a preadoptive placement because the Danforths are not a foster home or institution. And they argue that Congress's decision to exclude guardians and conservators from the "preadoptive placement" definition shows that guardians and conservators should not be considered preadoptive placements under ICWA. *Compare* 25 U.S.C. § 1903(1)(i), *with id.* § 1903(1)(iii). *See Luchanski v. Congrove*, 193 Ariz. 176, 179, ¶ 14 (App. 1998) (We do not read terms into a provision from which they are specifically excluded.). *But see Marx v. Gen.*

---

9    Other states have interpreted ICWA's "foster care placement" definition to include guardianship proceedings. *In re Guardianship of Eliza W.*, 938 N.W.2d 307, 313 (Neb. 2020). But in those cases, the guardianship proceedings' facts tracked ICWA's definition of "foster care placement." *See, e.g.*, *Eliza W.*, 938 N.W.2d at 312-13; *In re Guardianship of Q.G.M.*, 808 P.2d 684, 685-87, 688-89, ¶¶ 2-4, 9-10 (Okla. 1991); *Empson-Laviolette v. Crago*, 760 N.W.2d 793, 796-97, 799 (Mich. App. 2008); *In re Custody of A.K.H.*, 502 N.W.2d 790, 792-93 (Minn. App. 1993). In *Eliza W.*, for example, the guardianship proceeding's purpose was to remove the child from her biological parent's custody, where parental rights were not terminated, and place the child with a guardian. *See* 938 N.W.2d at 310, 313. Those circumstances do not exist here.

*Revenue Corp.*, 568 U.S. 371, 381 (2013) ("The force of any negative implication . . . depends on context."); *United States v. Vonn*, 535 U.S. 55, 65 (2002) (The negative implication canon, *expresio unius*, "is only a guide."). While Congress excluded guardians and conservators from the preadoptive placement definition, it is not apparent that the Danforths can be classified only as "guardians," which ICWA does not define. *See* 25 U.S.C. § 1903.

¶45        And the Danforths do not establish why they are not a "foster home" under the "preadoptive placement" category. ICWA does not define a "foster home." *See* 25 U.S.C. § 1903. We start with the general assumption that "in the absence of a plain indication to the contrary . . . Congress when it enacts a statute is not making the application of the federal act dependent on state law." *See Holyfield*, 490 U.S. at 43 (quoting *Jerome v. United States*, 318 U.S. 101, 104 (1943)). The parties and amicus offer no specialized federal meaning for the term. We see no reason to interpret the term differently than its ordinary meaning—as a household maintained by persons caring for a minor child who is not their child. *See Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995) ("When terms used in a statute are undefined, we give them their ordinary meaning."); *foster care, Black's Law Dictionary* (12th ed. 2024) ("Foster home" means a "household in which foster care is provided to a child who has been removed from his or her birth or adoptive parents" and it is usually "an individual home."); *see also* Merriam-Webster's Collegiate Dictionary (11th ed. 2012) (A "foster home" is "a household in which an orphaned, neglected, or delinquent child is placed for care."); *see also* A.R.S. § 8-501(A)(6) (A "foster home" is "a home that is maintained by any individual or individuals having the care or control of minor children, other than those related to each other by blood or marriage, or related to such individuals, or who are legal wards of such individuals."). The Danforth's home fits within the ordinary meaning of "foster home."

¶46        To be a preadoptive placement, the action must also be "after the termination of parental rights," 25 U.S.C. § 1903(1)(iii), which means after an action causing termination of a parent-child relationship, *see id.* § 1903(1)(ii). And a "parent" is "any biological parent or parents of an Indian child or any Indian person who has lawfully adopted an Indian child." *Id.* § 1903(9). Thus, "preadoptive placement" contemplates scenarios where the relationship between a biological parent or an Indian adoptive parent and an Indian child has terminated. *See id.* § 1903(1)(iii), (1)(ii), (9).

¶47        Kurtz was neither Allie's biological parent nor an Indian person, so the termination of her parental rights does not fall within the

statute. *See* 25 U.S.C. § 1903(1)(iii), (1)(ii), (9). But Allie's biological mother falls within the statute, as she had her parental rights terminated. *Id.* So the question is whether the "after the termination of parental rights" limitation in the "preadoptive placement" definition is so temporally broad to include any subsequent proceeding after Allie's biological parent's rights were terminated. *See id.* § 1903(1)(iii). At least one other state has concluded that "ICWA's provisions are intended to apply not just to the initial removal and placement of an Indian child, but also to subsequent placements." *See Dep't of Hum. Servs. v. J.G.*, 317 P.3d 936, 947 (Or. App. 2014).

**¶48**         And to interpret ICWA otherwise here would be to effectively divest Allie and the Community from the protections afforded by ICWA only because Kurtz was not an Indian person. We have held that ICWA does not lose its applicability just because an Indian child resides in a non-Indian home. *Coconino County Juv. Action No. J-10175*, 153 Ariz. 346, 349 (App. 1987). In *Coconino County Juvenile Action No. J-10175*, we held:

> The fact that a child may have been living in a non-Indian home is no reason, standing alone, to dispense with the provisions of the Act. . . . When the Act is read as a whole, it is clear that Congress has made a very strong policy choice that Indian children, including those who have a non-Indian parent, belong in an Indian home.

*Id.*; *see also Michael J.*, 198 Ariz. at 157, 158, ¶¶ 13, 16 (The court rejected the existing Indian family exception, by which a court will not apply ICWA unless an Indian child is removed from an existing Indian family.).

**¶49**         Moreover, the United States Department of the Interior, Bureau of Indian Affairs promulgated guidelines ("Guidelines") to help state courts comply with ICWA, and they support that this proceeding falls inside ICWA's ambit. *See* Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67584 (Nov. 26, 1979); *see also Steven H.*, 218 Ariz. at 572, ¶ 24 (We look to the Guidelines for assistance in interpreting ICWA.). The Guidelines advise that the "entire legislative history makes it clear that [ICWA] is directed primarily at attempts to place someone other than the parent or Indian custodian in charge of raising an Indian child—whether on a permanent or temporary basis." 44 Fed. Reg. at 67587. This is the situation before us. If the superior court grants the guardianship, the Danforths—someone other than Allie's parent or an Indian person—would oversee her care.

¶50         This guardianship proceeding tracks ICWA's "preadoptive placement" definition. *See* 25 U.S.C. § 1903(1)(iii). It is the temporary placement of Allie (an Indian child) in a foster home (the Danforth's home). And it takes place after Allie's biological parent's rights were terminated but before or in place of adoption by the Danforths. *See id.* Because we construe ICWA's statutory language liberally to preserve tribal interests, we conclude that this Title 14 guardianship proceeding is a preadoptive placement, and thus ICWA applies.[10] *See Valerie M. v. Ariz. Dep't of Econ. Sec.*, 219 Ariz. 331, 334, ¶ 10 (2009).

### 2.         The Community Did Not Have Exclusive Jurisdiction.

¶51         Next, we consider whether the Community had exclusive jurisdiction over the child custody proceeding under ICWA. *See* 25 U.S.C. § 1911(a).

¶52         The superior court has jurisdiction over Title 14 guardianship proceedings. A.R.S. § 14-5102(A). But when ICWA applies, the Act limits the superior court's jurisdiction. *See Holly C.*, 247 Ariz. at 505, ¶ 28. When the exclusive jurisdiction elements are not satisfied, "tribal courts have concurrent jurisdiction with state courts over custody proceedings involving Indian children not residing or domiciled within the reservation." *Maricopa County Juv. Action No. JD-6982*, 186 Ariz. 354, 356 (App. 1996); *see also* 25 U.S.C. § 1911(b). When a tribal and state court have concurrent jurisdiction, a state court can transfer the proceeding to a tribal court. *See Gila River Indian Cmty.*, 242 Ariz. at 279, ¶ 1. Although ICWA's transfer provision, 25 U.S.C. § 1911(b), does not apply to state preadoptive placements, "it also does not prohibit the transfer of such actions to tribal court." *Id.*

¶53         ICWA provides that a tribe has exclusive jurisdiction over a child custody proceeding as follows:

---

[10]     We conclude that ICWA applies based on the facts before the superior court. Amicus Lisa Jones submitted a brief in this court alleging new facts about Kurtz's will and a named guardian. But the parties did not provide the superior court this evidence, and amicus cannot raise their own issues. *See City of Tempe v. Prudential Ins. Co. of Am.*, 109 Ariz. 429, 432 (1973) ("[A]micus curiae are not permitted to create, extend, or enlarge the issues."). On remand, if the parties believe this changes the ICWA legal analysis, the parties can raise the issue.

An Indian tribe shall have jurisdiction exclusive as to any State over any child custody proceeding involving an Indian child who resides or is domiciled within the reservation of such tribe, except where such jurisdiction is otherwise vested in the State by existing Federal law. Where an Indian child is a ward of a tribal court, the Indian tribe shall retain exclusive jurisdiction, notwithstanding the residence or domicile of the child.

25 U.S.C. § 1911(a).

¶54            The superior court's dismissal order found that Allie was a ward of the Community's court, and thus the Community had exclusive jurisdiction. The Danforths argue that the Community lacked exclusive jurisdiction because Allie was not domiciled or residing on the reservation and because the Community could not have retained jurisdiction when it issued the ward order—thereby making the order void. The Danforths also contend that "the tribal court here lacked jurisdiction to make [Allie] its ward in the first place, and the state court was then *not* required to give full faith and credit to that court's orders." The Community argues that it had the authority to enter the ward order, which gave the Community exclusive jurisdiction over the case.

¶55            Allie was not domiciled or living on the reservation during the guardianship proceeding, so the Community did not have exclusive jurisdiction under the first sentence of 25 U.S.C. § 1911(a). Thus, whether the Community had exclusive jurisdiction depends on Section 1911(a)'s second sentence—whether Allie was a ward of its court. *See* 25 U.S.C. § 1911(a); *see also Gila River Indian Cmty.*, 242 Ariz. at 280, ¶ 13 (Section 1911(a) "acknowledges exclusive tribal jurisdiction over . . . cases involving Indian children who are wards of tribal courts regardless of residence or domicile.").

¶56            Arizona courts have not determined when a tribal court establishes exclusive jurisdiction under the wardship provision of 25 U.S.C. § 1911(a). But other jurisdictions have interpreted Section 1911(a)'s wardship provision to require that the wardship order be entered while the child is residing or domiciled on the reservation. *See, e.g.*, *In re Adoption of T.R.M.*, 525 N.E.2d 298, 306 (Ind. 1988). Indiana's supreme court held that Section 1911(a) "can pertain only to such wardship orders of the tribal court which are entered while the child is residing or domiciled on the reservation." *Id.* The court reasoned that "[t]his allows the tribal court to exercise subsequent exclusive jurisdiction notwithstanding a state court

proceeding when the domicile or residence of the child has changed after the initial tribal court order of wardship." *Id.*

¶57 South Dakota's supreme court held the same, recognizing the plain language of Section 1911(a) and the caselaw "demonstrate the only effective way a wardship order can be used to obtain exclusive jurisdiction is to enter the order while the Indian child is domiciled or residing on the reservation and before the proceeding commenced." *See In re J.D.M.C.*, 739 N.W.2d 796, 805, ¶ 25 (S.D. 2007). The court held that the tribe could not obtain exclusive jurisdiction by declaring the child a ward after the proceedings began. *Id.*

¶58 The Community argues that *T.R.M.* and *J.D.M.C.* are distinguishable because, unlike here, those cases did not begin in tribal court. *See T.R.M.*, 525 N.E.2d at 302; *J.D.M.C.*, 739 N.W.2d at 799, ¶ 2. But the Community fails to explain how this difference affects the statutory interpretation that the ward order be entered while the child is on the reservation and before the proceeding commences. The Community also points out that *T.R.M.* ostensibly relies on the existing family doctrine exception in its ICWA application analysis. Still, the court said that analysis was "separate and independent" from its jurisdiction analysis. *See T.R.M.*, 525 N.E.2d at 303.

¶59 We agree with the South Dakota Supreme Court's conclusion that for a tribe to exercise exclusive jurisdiction, its ward order must be entered before the proceeding commences. *See J.D.M.C.*, 739 N.W.2d at 805, ¶ 25. This follows the "general principle[] of law" that "jurisdiction is established at the time of filing . . . and cannot be ousted by subsequent actions or events." *See Resol. Tr. Corp. v. Foust*, 177 Ariz. 507, 517 (App. 1993); *see also Spear v. McDermott*, 916 P.2d 228, 234 (N.M. App. 1996) ("It is a well-established rule in both federal and state courts that jurisdiction over a case is established at the time an action is filed and cannot be voided by later events."); *People In re S.G.V.E.*, 634 N.W.2d 88, 92 (S.D. 2001) ("[J]urisdiction under ICWA is established as of the date the action is filed.").

¶60 Moreover, this reading follows Section 1911(a)'s use of the word "retain." *See* 25 U.S.C. § 1911(a). The wardship provision allows a tribe to "retain exclusive jurisdiction"; it does not confer exclusive jurisdiction. *Id.* Allowing the Community to establish exclusive jurisdiction through a ward order entered during the state proceedings would ignore the provision's plain language that a tribe can only "retain" exclusive jurisdiction when the child is a ward. *Id.; see also Gila River Indian Cmty.*, 242

20

Ariz. at 280, ¶ 11 (citations omitted); *In re C.J.*, 108 N.E.3d 677, 696-97, ¶ 101 (Ohio App. 2018).

¶61        But the Community points to its Children's Code to support its continuing jurisdiction theory. Under the Community's Children's Code, its Children's Court has subject matter jurisdiction over "child in need of care matters" and personal jurisdiction over "[e]nrolled Community members under 18 years of age without regard to domicile." Children's Code § 7.104(A), (B)(1). The Community maintains that once its Children's Court's jurisdiction is established, it continues until the child reaches age 18 or the jurisdiction is terminated by court order. *See* Children's Code § 7.104(C)(1), (3).

¶62        The Community asserts that "[t]his case started in Tribal Court in 2011" and that "[i]n 2014, [Allie] was a ward of the Gila River Indian Community Tribal Court." But the record does not support these assertions. The Community filed its 2023 ward order in the superior court and provided this court with its Children's Court's records beginning in 2023.

¶63        The tribal law only shows that the Community could enter a ward order for Allie. It does not mean that the Community entered the ward order timely under ICWA's dual jurisdictional scheme to grant the Community exclusive jurisdiction in this guardianship proceeding. Moreover, just like a particular state law does not change ICWA's application, neither would a particular tribe's law. *See Holyfield*, 490 U.S. at 43. The Community's Children's Code does not resolve the federal question.

¶64        When the Danforths petitioned for guardianship in May 2023, and the superior court established jurisdiction, the Community's 2023 ward order did not exist. *See Resol. Tr. Corp.*, 177 Ariz. at 517 ("[J]urisdiction is established at the time of filing."). The Community did not have exclusive jurisdiction because Allie was not a ward of the Community's Children's Court when the Danforths petitioned. *See* 25 U.S.C. § 1911(a). The Community did not later obtain exclusive jurisdiction by entering its order during the state proceedings.

¶65        We acknowledge that ICWA requires every state to "give full faith and credit to the public acts, records, and judicial proceedings of any Indian tribe applicable to Indian child custody proceedings." 25 U.S.C. § 1911(d). But on the record provided, we conclude that under ICWA, Allie was not a ward of the Community's court when the superior court

established jurisdiction, so the Community did not have exclusive jurisdiction under the Act. *See* 25 U.S.C. § 1911(a). As a result, the superior court erred by dismissing the guardianship proceeding for lack of jurisdiction.

**C.      The Danforths Are Entitled to a Hearing to Show Why a Transfer to the Community's Children's Court Is Not Appropriate.**

¶66       As a general rule, ICWA requires a state court to transfer jurisdiction to the tribal court unless the court finds good cause to the contrary. *See* 25 U.S.C. § 1911(b); *see also Maricopa County Juv. Action No. JD-6982,* 186 Ariz. 354, 356 (App. 1996). But 25 U.S.C. § 1911(b) does not apply to preadoptive placements. *Gila River Indian Cmty.*, 242 Ariz. at 279, ¶ 1. Still, Section 1911(b) does not prevent transfer to tribal court. *See id.* The Danforths objected to a transfer and have a right to be heard before the superior court decides whether to transfer the case. We disagree with the Community that we can rely on the summary dismissal by the superior court as an exercise of that court's discretion because it specifically said that it simply lost jurisdiction. If the superior court denies transfer, it still must follow the preadoptive placement preferences for Indian children under 25 U.S.C. § 1915(b), absent good cause to the contrary. *See* 25 U.S.C. § 1915(b); *Gila River Indian Cmty.*, 238 Ariz. at 534, ¶ 11.

## CONCLUSION

¶67       We vacate and remand for proceedings consistent with this opinion.

B A I L E Y, J., concurring in part and dissenting in part:

¶68       I agree with the majority that the superior court violated the Danforths' due process rights.  I further agree that ICWA is limited to the four proceedings defined in 25 U.S.C. § 1903(1), the Danforths are not an adoptive placement, and if ICWA applies, the Community's tribal court does not have exclusive jurisdiction because this case does not involve a foster care placement or termination of parental rights.

¶69       But I disagree with the majority's conclusion that the Danforths are a preadoptive placement because they qualify as a foster home.  In my view, interpreting foster home as subsuming guardians is

contrary to Congress's intent—as expressed by Congress's decision to include guardians under ICWA's foster care placement definition, but not ICWA's preadoptive placement definition.

**¶70**　　　"In interpreting ICWA, we attempt to give effect to the will of Congress as expressed in the statutory language, which we construe liberally in favor of the interest in preserving tribal families." *Valerie M. v. Ariz. Dep't of Econ. Sec.*, 219 Ariz. 331, 334, ¶ 10 (2009) (citing *Steven H. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 566, 570, ¶ 14 (2008)). "[W]e 'start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used.'" *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 47 (1989) (quoting *Richards v. United States*, 369 U.S. 1, 9 (1962); *accord Russello v. United States*, 464 U.S. 16, 21 (1983)). We do not rely on state-law definitions; rather, we consider ICWA's purpose and the "generally accepted meaning of the term[s]" used. *Id.* at 44, 47.

**¶71**　　　ICWA applies to four child custody proceedings: (1) foster care placements; (2) termination of parental rights; (3) preadoptive placements; and (4) adoptive placements. *See* 25 U.S.C. § 1903(1). ICWA defines a "foster care placement" as "any action removing an Indian child from its parent or Indian custodian for temporary placement in a *foster home or institution or the home of a guardian or conservator* where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated." 25 U.S.C. § 1903(1)(i) (emphasis added). In the same section, two paragraphs later, ICWA defines "preadoptive placement" as "the temporary placement of an Indian child in a *foster home or institution* after the termination of parental rights, but prior to or in lieu of adoptive placement." 25 U.S.C. § 1903(1)(iii).

**¶72**　　　The majority acknowledges that "Congress excluded guardians and conservators from the preadoptive placement definition" and that "we do not read terms into a provision from which they are specifically excluded." *See supra* ¶ 44. The majority then concludes that because we construe ICWA liberally in the tribe's favor, the term "foster home" is broad enough to encompass the Danforths' home. *See supra* ¶¶ 45, 50. In doing so, the majority adds guardians to ICWA's preadoptive placement definition, despite Congress having excluded them.

**¶73**　　　Had Congress intended "foster home" to subsume, or be synonymous with, "guardian," Congress would not have included "foster home" *and* "home of a guardian" under ICWA's foster care placement definition, but only "foster home" under ICWA's preadoptive placement definition. *See* 25 U.S.C. § 1903(1)(i), (iii). In my view, by doing so, Congress

23

expressed its intent that we treat foster homes and guardians as two distinct placements.

¶74 Further, "guardian" and "foster home" had different meanings when Congress enacted ICWA. The Black's Law Dictionary edition published in 1979 defined a "[f]oster home" as "a home for children without parents or who have been taken from their parents." *Foster Home*, Black's Law Dictionary ("Black's") (5th ed. 1979). *See also Foster Home*, Webster's Third New International Dictionary ("Webster's") (1971) (defining a "foster home" as "a household in which an orphaned, neglected, or delinquent child . . . is placed for care, usu[ally] with the approval of the government or of a social-service agency"). In contrast, it defined "[g]uardian" as:

> A person lawfully invested with the power, and charged with the duty, of taking care of the person and managing the property and rights of another person, who, for defect of age . . . is considered incapable of administering his own affairs. One who legally has the care and management of the person, or the estate, or both, of a child during its minority.

*Guardian*, Black's. *See also Guardian*, Webster's (defining "guardian" to include "one who has or is entitled or legally appointed to the care and management of the person or property of another (as a minor or a person incapable of managing his own affairs)").

¶75 We do not rely on state-law definitions, so the fact Arizona refers to the Danforths' request under Title 14 as a "guardianship" is not conclusive. *See Miss. Band of Choctaw Indians*, 490 U.S. at 44; Ariz. Rev. Stat. ("A.R.S.") § 14-5204. But if the Danforths are appointed as Allie's guardians under Title 14, the Danforths will be responsible for "[t]ak[ing] reasonable care of [Allie's] personal effects and commenc[ing] protective proceedings if necessary to protect [Allie's] other property," "[a]pply[ing] any available monies of [Allie] to [her] current needs for support, care and education," "[c]onserv[ing] any excess monies for [Allie's] future needs," and "[r]eport[ing] the condition of [Allie] and of [Allie's] estate which has been subject to his [or her] possession or control, as ordered by the court on petition of any person interested in [Allie's] welfare or as required by court rule." *See* A.R.S. § 14-5209(B) (listing a Title 14 guardian's duties). These duties closely track a guardian's responsibilities under the 1970's definition—and the definition of "foster home" does not implicate those same responsibilities.

¶76　　　　Further, federal law continues to differentiate between foster homes and guardians. *Compare* 42 U.S.C. § 675(7) (defining a "legal guardianship" as "a judicially created relationship between child and caretaker which is intended to be permanent and self-sustaining as evidenced by the transfer to the caretaker of the following parental rights with respect to the child: protection, education, care and control of the person, custody of the person, and decisionmaking"), *with* 42 U.S.C. § 672(c)(1) (defining a "foster family home" as "the home of an individual or family [] that is licensed or approved by the State in which it is situated as a foster family home that meets the standards established for the licensing or approval; and [] in which a child in foster care has been placed in the care of an individual, who resides with the child and who has been licensed or approved by the State to be a foster parent"). *See also* 42 U.S.C. § 672(k)(3)(B) ("If . . . a child who has been in an approved placement in a qualified residential treatment program is going to return home *or be placed with a fit and willing relative, a legal guardian, or an adoptive parent, or in a foster family home . . . .*" (emphasis added)).

¶77　　　　We do "not look beyond the clear meaning of [ICWA's] express statutory terms unless a literal interpretation would thwart the purpose of the statutory scheme or lead to absurd results." *Gila River Indian Cmty. v. Dep't of Child Safety*, 242 Ariz. 277, 280, ¶ 11 (2017) (quoting *Steven H.*, 218 Ariz. at 570, ¶ 14 (quoting *Navajo Nation v. Hodel*, 645 F. Supp. 825, 827 (D. Ariz. 1986))). Applying ICWA to only guardianships in foster care placements does not thwart ICWA's purpose, nor does it lead to an absurd result — it simply recognizes that ICWA routinely differentiates between the different types of child custody proceedings that Congress expressly defined in ICWA. *Cf. id.* at 281, ¶¶ 17–18 (stating that distinguishing between foster care placement and termination-of-parental rights actions does not thwart ICWA's purpose or lead to absurd results because "Congress's differentiation throughout ICWA indicates its desire to place certain federal mandates on states for foster care placement and termination-of-parental-rights actions but not preadoptive and adoptive placements").

¶78     I decline to read into ICWA a term that Congress expressly chose to include under one definition, but not another definition in the same section.  Accordingly, although I concur with the majority in reversing the superior court's dismissal of the Danforths' petition and remanding for further proceedings, I would hold that the Danforths are not a preadoptive placement under ICWA.



AMY M. WOOD • Clerk of the Court
FILED:    AGFV